Coy E. BAILEY, Jr., Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Dec. 16, 1986.
Decided: March 3, 1987.

Anthony A. Figliola, Jr., Wilmington, for appellant.

Loren C. Meyers (argued), Timothy J. Donovan, Jr., Deputy Atty. Gen., Wilmington, Richard E. Fairbanks, Jr., Chief of Appeals Div., Wilmington, for appellee.

Before, MOORE, WALSH and HOLLAND, JJ.

HOLLAND, Justice:

In July 1980, the defendant, Coy Edward Bailey, Jr., was initially convicted of murder in the first degree and possession of a deadly weapon during the commission of a felony by a jury in the Superior Court, Kent County.[1] On appeal, this Court reversed the 1980 convictions and remanded the case to the Superior Court for a new trial. *Bailey v. State*, Del.Supr., 440 A.2d 997 (1982). The defendant's second trial, in October 1983, once again took place in Kent County. During the defendant's second trial, three of the State's witnesses made references to the defendant's first trial. The third witness also referred to Bailey's conviction. Following the third reference to Bailey's 1980 trial and the resulting conviction, the Superior Court Judge declared a mistrial *sua sponte*. Bailey's third trial in Kent County began on September 10, 1984. The 1984 jury was unable to arrive at a unanimous verdict at the conclusion of the presentation of the evidence. A mistrial was declared once again. On October 18, 1984, the defendant's motion for a change of venue was granted. Bailey's fourth trial began on April 1, 1985 in New Castle County. In April 1985, Bailey was convicted of murder in the first degree and an associated weapon's offense. Bailey was sentenced to life imprisonment without the benefit of probation or parole for murder and also received a consecutive fifteen year prison term for the weapon's offense. The defendant now appeals those convictions following his fourth trial.

The prior opinion of this Court states the facts surrounding the alleged crime at length. *Bailey v. State*, Del.Supr. 440 A.2d 997 *(1982)*. We will only repeat the basic facts here. Even though the evidence at the fourth trial was not identical to the evidence in the prior trials, the contentions of the parties remained substantially the same with respect to the crime itself. The defendant was convicted of intentionally shooting Frank Dukes to death on June 10, 1978 at a makeshift firing range. Present with Bailey at the scene of the shooting was Michael Sponaugle, the State's chief witness. According to Sponaugle, he, the defendant, and the victim were engaged in shooting empty glass bottles off of a log behind the residence of Sponaugle's parents. Sponaugle asserts that as Dukes was setting up additional bottles on the log, Bailey intentionally shot Dukes with a .44 revolver. Immediately following the incident, Sponaugle claims that he returned to his parents' house and heard a second shot emanating from the shooting scene. Sponaugle's testimony is hotly disputed by Bailey, who presents a dramatically different version of the events. According to Bailey, it was Sponaugle who shot the victim twice, once from some distance and again in the back of the head as he lay wounded near the log. Similarly, there is disagreement as to what transpired after the shooting.

Bailey appeals from his 1985 conviction on numerous grounds. He contends through his attorney that: 1) jeopardy attached during his second trial and his retrial in 1985 was barred by the double jeopardy provisions of the United States and Delaware Constitutions; 2) he was denied a speedy trial contrary to his rights under the United States and Delaware Constitutions; 3) State interference with communication between the defendant and his counsel violated his right to effective assistance of counsel as guaranteed by the United States and Delaware Constitutions; 4) the State's failure to preserve evidence violated the defendant's State and Federal rights to due process; and 5) the trial Court erred in not instructing the jury on a charge of second degree murder.

In an order dated September 17, 1986, this Court permitted Bailey to supplement his attorney's opening brief with argu-

---

**1.** The jury that convicted the defendant in 1980 was unable to reach a unanimous verdict on the imposition of the death penalty for the murder conviction. Therefore, the defendant was sentenced to life imprisonment without benefit of probation or parole for first degree murder plus an additional thirty years for the weapon's offense.

ments made by Bailey in an affidavit, with attachments, accepted by this Court as a *pro se* "Supplemental Brief" but subject to the limitation that this Court would only consider for review on appeal those questions raised by the defendant *pro se* in the papers filed which were fairly presented to the trial Court and only to the extent that the defendant's substantive argument and position on such questions is clearly discernable from the papers filed. *Bailey v. State*, Del.Supr. No. 324, 1985 (September 17, 1986) (Horsey, J.) (Order). In his "Supplemental Brief," the defendant addresses two issues raised by his attorney in the appellant's opening brief, i.e., the double jeopardy and speedy trial contentions. Bailey's *pro se* submission also identifies three additional issues: 1) that the State did not disclose that Sponaugle had been given immunity from prosecution before testifying and did not disclose the contents of the testimony at the hearing when immunity was originally granted to Sponaugle; 2) that the 1985 jury was not instructed about the grant of immunity to Sponaugle although such an instruction had been given at Bailey's 1980 trial; and 3) that the attorneys representing Bailey in the 1985 trial were ineffective. The defendant raises several other issues but those matters are most fairly categorized as specific examples of the ineffectiveness of his 1985 trial counsel, e.g. failure to file various motions, failure to raise an objection to the arrest warrant and improperly filing "old" motions. We will consider all issues that have been properly raised by Bailey and his attorney.

## DOUBLE JEOPARDY

The defendant's first argument is that the prosecution *intentionally* elicited a remark by a state witness which prompted the trial court to declare a mistrial *sua sponte*, during the course of the defendant's second trial in 1983. Bailey contends that any subsequent trial was barred by his State and Federal Constitutional right to be free from being placed in jeopardy more than once for the same crime. To put this contention by the defendant into proper perspective, the facts and circumstances which led the trial Court to declare the mistrial must be reviewed.

During the defendant's retrial in October 1983, three witnesses referred to his first trial and the third witness to do so also referred to Bailey's prior conviction. The first of the three witnesses to make such a reference was Patricia Bailey, a prosecution witness and the defendant's former wife. She had testified at the 1980 trial. During her cross-examination by the *defense counsel* in the 1983 trial, she was questioned about statements she had made at "a prior proceeding" and asked if she had testified under oath. She responded, "Do you mean the last trial?" Neither the defense counsel or the prosecutor asked for any corrective action from the judge.

On the next trial day, Jerry Price, a friend of the defendant, testified for the prosecution. Price stated that after he had learned of the defendant's arrest and imprisonment, he had visited the defendant several times. Price testified that Bailey told him of his desire to have Sponaugle, the chief prosecution witness, killed. During the cross-examination of Price, defense counsel asked Price when the defendant had first solicited his help in eliminating Sponaugle. Bailey's counsel then asked Price about the timing of his disclosure to police of these conversations with the defendant:

Q. When is the first time you ever communicated these alleged conversations to the authorities?

A. When?

Q. Yes.

A. It was when this first trial, these new proceedings started, two, three months ago maybe.

At that point, the jury was taken out of the courtroom. Defense counsel argued the need for a mistrial, or, at a minimum, cautionary instructions to the jury. The prosecutor stated that Price had been told not to mention the first trial. The prosecutor also pointed out that the defense counsel had, in the cross-examination of Patricia Bailey,

received a similar response.[2] The trial judge indicated his willingness to give the jury a cautionary instruction or to conduct *voir dire* into the jury's knowledge of the previous trial.[3] However, the trial judge also advised defense counsel that doing so would necessarily compound the problem since the jury, in the process, would implicitly learn that there had been a previous trial. The defense counsel responded by renewing his motion for a mistrial. That request was denied. No cautionary instruction was given to the jury.[4]

The prosecution's next witness was Gary Lee Hastings. Hastings had been incarcerated with the defendant at Delaware Correctional Center in late 1981 and early 1982. The prosecution argues that it was attempting to establish, through Hastings' account of his conversations with Bailey, the latter's intent to sabotage his murder prosecution through Sponaugle's murder when the following exchange took place:

Q. Did you discuss with Mr. Bailey in addition to the contract the charges for which you were in jail?

A. Yes, ma'am, we had discussed that.

Q. Did you discuss the charges for which he was in jail?

A. No, ma'am. it was common knowledge to the institution what Mr. Bailey was doing time for: a life sentence for murder.

Immediately following this answer, the trial court stopped the proceedings and the jury was taken out of the courtroom. The following exchange then occurred:

THE COURT: We have almost two weeks involved in it, but I think that about locks it up.

MS. BRADY [prosecutor]: I think it does, Your Honor.

THE COURT: A mistrial is declared. The case will be rescheduled for trial at a later date. We will stand in recess.

Defense counsel remained silent and did not object to or argue against the trial judge's decision to declare a mistrial.

The concept of one not being placed in jeopardy twice for the same offense goes as far back as early Greek and Roman canon law. *Bartkus v. Illinois*, 359 U.S. 121, 152, 79 S.Ct. 676, 696, 3 L.Ed.2d 684 (1959); *see United States v. Jenkins*, 490 F.2d 868, 870–871 (2d Cir.1973), *aff'd.*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). In accordance with this philosophy, the draftsman of the United States and the Delaware Constitutions expressly included the common law rule [5] that a person must not be put in jeopardy twice for the same offense. Bailey contends that because of

---

**2.** "MR. MEKLER: May we approach the Bench, Your Honor?

THE COURT: All right. Take the jury out. (The jury left the courtroom.)

MR. MEKLER: Your honor, this is the second time that there has been reference to a first trial. We have advised all of our witnesses that they are not to refer to it. I let the first one slide because I really wanted to avoid just what happened this morning. Sometimes by having raised these objections we draw attention to things.

I believe the first one it is in and to itself the basis for a mistrial. Two in a row, not in a row but two inconsecutive (sic) days really makes it almost impossible to purify or purge it from the juror's mind. I understood counsel was responsible for their own witnesses in not mentioning certain things that are inappropriate.

I think we have a clear basis for an application for mistrial.

THE COURT: Was this witness instructed not to go into that?

MS. BRADY: Yes, Your Honor. I would note, Your Honor, this witness did say this new proceeding and then said two to three months ago. Further cross-examination would proba-

bly reveal that it was longer than two to three months ago however that information became known to the State. I would note defense counsel themselves have mentioned the first trial on one occasion."

**3.** "THE COURT: Okay. I will entertain any instruction you want to give them or I will begin now an in-depth examination of each juror to see what they know about a first trial if you want me to do it."

**4.** Mr. Mekler: My application is for mistrial.

The Court: Your application will be denied, but as I say I will entertain any instructions that you want me to give the jury now or later and I will question them individually if you want me to, but there is a great danger in the second procedure and I understand you don't want me to do that.

Bring the jury in. We will proceed.

**5.** Traditionally, in a criminal prosecution, a plea of *autrefois acquit* or *autrefois convict* is a good defense.

the circumstances under which his second trial was interrupted, any subsequent prosecution violates the provisions of the Fifth Amendment to the United States Constitution and Article I, § 8 of the Delaware Constitution of 1897. We find that the analysis of his claim under either Constitutional provision is identical.

■ The Double Jeopardy provisions of the State and Federal Constitutions represent a policy of finality for the benefit of the defendant in criminal proceedings. In reviewing that policy, courts have been acutely aware of the delicate balance between the right of the government to vindicate its vital interest in enforcing criminal laws and the personal strain which one criminal trial and *a fortiori* multiple criminal trials represents for the individual defendant. However, the double jeopardy provisions do not guarantee a defendant that the government will be prepared in all circumstances to vindicate the social interest in law enforcement through one single proceeding for a given offense. Thus, for example, a defendant can be retried for the same offense when the defendant has won a reversal of a conviction on appeal. *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *Green v. United States*, 355 U.S. 184, 189, 78 S.Ct. 221, 224, 2 L.Ed.2d 199 (1957). The question remains, however, in what circumstances is a retrial to be precluded when the prior trial is aborted *prior to the verdict.* A motion by the defendant for a mistrial, which is granted, generally removes any barrier to reprosecution. *See Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

The most difficult double jeopardy question rises in the context of cases like the present one where the proceedings are stopped prior to verdict *sua sponte* by the trial courts without the defendant's application to halt the proceedings. There is a critical difference between reprosecution after a *sua sponte* judicial mistrial declaration and reprosecution after the granting of a defendant's motion for a mistrial. The defendant has a significant interest in the decision of whether or not to take a case

from the jury when circumstances occur which might be thought to warrant the declaration of a mistrial. Cf. *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). In dealing with situations when there has been a *sua sponte* judicial mistrial declaration, this Court and the United States Supreme Court have both declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial. Cf. *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547; *Rentoul v. State*, Del.Supr., 301 A.2d 284 (1973). Compare *Fanning v. Superior Court in and for New Castle County*, Del.Supr. 320 A.2d 343 (1974). A mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide.

"[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public interest in fair trials designed to end in just judgments."

*Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949) *reh. den.* 337 U.S. 921, 69 S.Ct. 1152, 93 L.Ed. 1730 (1949).

■ The standard of appellate review for testing the trial judges exercise of his discretion in declaring a mistrial in the absence of a defense motion is "manifest necessity". The doctrine of "manifest necessity" was originally enunciated in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). In *Perez*, Justice Storey expressed the following thoughts on the problem of reprosecution after a mistrial had been declared without the consent of the defendant:

"We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be

defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." *Id.* at 580.

In the absence of a motion by a defendant for a mistrial, the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option to continue with the trial, until a scrupulous exercise of judicial discretion leads to the conclusion that the end of public justice would not be served by a continuation of the proceedings. Cf. *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547; *United States v. Perez,* 22 U.S. 579. An examination of the facts and circumstances in Bailey's case leads to the conclusion that the trial court's *sua sponte* mistrial declaration was appropriate and manifestly necessary during his 1983 trial.

▬▬▬ The record of the 1983 trial makes clear that a mistrial was declared because of the jury's exposure to information about the defendant's 1980 trial. *See Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). The jury not only learned that the defendant had been previously tried for the same charge, but that the 1980 trial had ended in a conviction. That information, regardless of how it is received, is inherently prejudicial and even more so when a juror is exposed to those facts during trial. *Hughes v. State,* Del.Supr., 490 A.2d 1034, 1044–47 (1985). In fact, the *Hughes* court acknowledged that the jury's awareness, in a subsequent trial, of a defendant's prior conviction later reversed on appeal, would be grounds for a mistrial.[6] *Id.* In *Hughes,* we held that "we are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged. It seems unreasonable to expect a juror to divorce from his deliberative process, knowledge that a defendant had been previously tried and convicted, and following a reversal has been once again subjected to prosecution. The mere expenditure of so much time and expense on the part of the state might lead the average lay person to assume that such a defendant must, in fact, be guilty." *Hughes,* 490 A.2d at 1044. We also held in *Hughes* that when prejudicial information is acquired by jurors *during trial,* there is a *high risk* that the prejudicial information will be held against the accused. "Such situations call for an even stricter standard than those in which the information was already known on account of pretrial situations." *Hughes v. State,* 490 A.2d at 1045. The decisions of the United States Supreme Court in cases involving possible juror bias are consistent

---

**6.** We continue to adhere to the view that juror knowledge of a prior conviction that comes during the course of subsequent proceedings is cause for a mistrial *ipso facto.* However, when a juror or jury acquires knowledge of "prior proceedings" for the first time during a subsequent trial, even though no result is mentioned, it may also warrant the declaration of a mistrial. Jurors in criminal cases may quickly conclude that the primary reason for a second trial is not a prior mistrial but reversal of a prior conviction after appeal. Each situation and possible solution must be scrupulously reviewed by the trial court. Juror knowledge of a prior trial during a subsequent trial must be assiduously avoided. Before any retrial for the same offense, counsel has a responsibility to caution their witnesses not to refer a prior trial, even as prior proceedings. Counsel should try to question witnesses about their prior testimony in generic terms, e.g. about "previously sworn statements in matters concerning these proceedings." If it becomes necessary to identify prior statements for impeachment purposes or to refresh the recollection of a witness with prior testimony, the entire inquiry might be made best after a side bar request for *voir dire* outside the presence of the jury.

with our own and support the same conclusion.[7]

In *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, the United States Supreme Court held that a mistrial was properly declared when highly prejudicial evidence came before the jury. In a dissent, Justice Marshall observed that the "manifest necessity" doctrine required that the record make clear either that there was no meaningful and practical alternative to a mistrial or that the trial court scrupulously considered available alternatives and found all wanting but a termination of the proceedings." *Id.* The record in this case clearly reflects that there were no meaningful and practical alternatives to a mistrial and that on an earlier occasion, the trial court had scrupulously considered available alternatives and found them all wanting.[8]

When the third prosecution witness not only referred to Bailey's prior trial but to Bailey's prior conviction, the Court immediately had the jury taken out of the court room. ▮ Defense counsel did not object to or argue against the trial judge's decision when it was announced. On appeal, however, Bailey takes issue with the trial court's conclusion "That about locks it up".

The absence of an explicit finding of the "manifest necessity" to declare a mistrial is not determinative. Where the nature of the error is one that would make reversal of any conviction on appeal a certainty, the appropriate finding may be implied from the declaration of a mistrial. *See Illinois v. Somerville,* 410 U.S. 458, 464, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973). Since the record provides sufficient justification for the trial court's ruling, the failure to explain that ruling more completely does not render it defective under either the State or Federal Constitution. Cf. *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824.

▮ The basis for the trial court's mistrial order is adequately disclosed by the record, which includes his prior exchange with counsel and his prior consideration of viable alternatives. The record reflects a conscious and deliberate judgment by the trial court in order to guarantee the defendant an impartial trial by a jury of his peers. Cf. *Rentoul v. State,* 301 A.2d 284 (Del.Supr.1973). Neither party has a right to have his case decided by a jury which may be tainted by bias. In these circumstances, the public's interest in fair trials

---

**7.** *Simmons v. United States,* 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 96 (1891) involved the possibility of juror bias caused by a newspaper story describing a letter written by defense counsel denying a charge by a third party that one of the jurors was acquainted with the defendant. The trial judge declared a mistrial because he concluded that it would be impossible for the jury to deliberate with the independence and freedom of action that is necessary for a fair trial. The United States Supreme Court affirmed, holding that the trial judge was justified in his conclusion that the publication of the letter had made it impossible for the jury to "act with the independence and freedom on the part of each jury requisite to a fair trial." *Id.* at 155, 12 S.Ct. at 172. In *Thompson v. United States,* 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894), the United States Supreme Court held that a mistrial was required when it was revealed that one of the trial jurors had served on the Grand Jury that indicted the defendant.

**8.** After the second witness referred to the defendant's prior trial, the following exchange took place:

> MR. MEKLER: The problem is that two State witnesses have now volunteered that and I say we have been careful and all our witnesses—

> THE COURT: No result has been mentioned. The result could have been a mistrial.

> MR. MEKLER: Your Honor, I suppose the problem is we don't know what is in the jury's mind and it leaves them open to speculate this person has been convicted and appealed.

> THE COURT: Okay. I will entertain any instruction you want to give them or I will begin now an in-depth examination of each juror to see what they know about a first trial if you want me to do it.

> MR. MEKLER: Your Honor, I of course am interested in the speedy judicial process as Your Honor and I want to be reasonable. I am thinking on my feet. It had been my intention at the end of the State's case to present the problem of the first mention of it because I thought at least at that point it would be far enough away from having spoken so as not to draw attention to it. I think at this point Your Honor's later suggestion may make the most sense. I don't know. I don't want to suggest on the record that I am saying that it will necessarily cure the problem, but it certainly might.

> THE COURT: It will necessarily compound it. I can't ask them what they know about a first trial without telling them there has been one.

designed to end in just judgments must prevail over the defendant's valued right to have his trial concluded before the jury that was impanelled. Cf. *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824. Where the declaration of a mistrial aborts a proceeding that could have produced a conviction that would have obviously been upset on appeal, the defendant's interest in proceeding to a verdict is outweighed by the competing and equally legitimate demand for public justice. *Illinois v. Somerville,* 410 U.S. 458 at 464, 93 S.Ct. 1066 at 1070, quoting *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834. Public justice would not have been served by a continuation of Bailey's 1983 trial. The record supports the manifest necessity for the trial judge to declare a mistrial *sua sponte* in 1983.

■ However, a finding of manifest necessity to declare a mistrial does not conclude the double jeopardy analysis. Even when the manifest necessity to declare a mistrial exists, as it did in this case, the double jeopardy clauses of the State and Federal Constitutions protect a defendant against governmental actions *intended* to provoke a mistrial and thereby subject the defendant to the substantial burdens imposed by multiple prosecutions. *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). The double jeopardy clauses bar retrials where "bad faith conduct by judge or prosecutor threatens the harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict the defendant." *United States v. Dinitz,* 424 U.S. at 611, 96 S.Ct. at 1081.

In *Oregon v. Kennedy,* the United States Supreme Court refined *Dinitz* and held that Double Jeopardy considerations would bar a subsequent trial only if the conduct giving rise to the mistrial was conduct by the prosecutor or the court which was *intended* to provoke the mistrial. 456 U.S. at 679, 102 S.Ct. at 209. Justice Powell concurred in the *Oregon v. Kennedy* holding that the *intention* of a prosecutor determines whether his conduct, viewed by the defendant and the court as justifying a

mistrial, bars a retrial of the defendant under the double jeopardy clause. Justice Powell further stated "because subjective intent may often be unknowable, I emphasize that a court—in considering a double jeopardy motion—should rely primarily upon the objective facts and circumstances of the particular case." *Id.*

An examination of the objective facts and circumstances in Bailey's case leads to the conclusion that the prosecutor did not intentionally cause the *sua sponte* declaration of a mistrial. As we have already noted, the following exchange between the prosecutor and Hastings took place immediately preceding the declaration of a mistrial:

"Q. Did you discuss with Mr. Bailey in addition to the contract the charges for which you were in jail?

A. Yes, ma'am, we had discussed that.

Q. Did you discuss the charges for which he was in jail?

A. No, ma'am. It was common knowledge to the institution what Mr. Bailey was doing time for: a life sentence for murder."

Shortly before this exchange which resulted in the declaration of a mistrial, Hastings testified that Bailey had offered him "a hit contract to kill Michael Sponaugle". The State argues that the line of questioning which ultimately led to the mistrial was intended to establish Bailey's desire to thwart his prosecution for murder through Sponaugle's death. Bailey argues prosecutorial intent to provoke a mistrial and asserts that the prosecutor's last two questions to Hastings lack relevance.

■ Evidence of the plot to kill Sponaugle was admissible to show Bailey's consciousness of guilt. *See Goldsmith v. State,* Del.Supr. 405 A.2d 109, 114 (1979). Prior to the line of questioning that led to the declaration of a mistrial, Hastings had testified that Bailey wanted Sponaugle killed and that Bailey wanted to hire Hastings to commit that crime. Hastings' knowledge of the charges facing Bailey was arguably important to demonstrate Bailey's motivation in seeking Sponaugle's death and to provide a factual basis for a

jury to infer Bailey's consciousness of guilt. While the State's questions could have been more artfully drawn to elicit the relevant testimony, Hastings' answer was simply non-responsive. Intentional prosecutorial action designed to provoke a mistrial is not established by a spontaneous declaration from witnesses or nonresponsive or unexpected answers to seemingly or arguably proper questions. Cf. *Commonwealth v. Yost*, 305 Pa.Supr. 316, 451 A.2d 549 (1982); *Commonwealth v. Miele*, 300 Pa.Supr. 197, 446 A.2d 298 (1982); *State v. Blanks*, 190 N.J.Super. 269, 463 A.2d 359, 364–365 (1983).

In *Oregon v. Kennedy*, Justice Powell found it significant that there was no sequence of prosecutorial over-reaching prior to the prejudicial question. During Bailey's trial in 1983, there was an absence of any other prosecutorial misconduct before that trial was terminated. In fact, the record reveals that the prosecution had voluntarily cautioned prior witnesses not to mention the first trial.[9] The defendant cannot support his allegation that the prosecutor intended to provoke a mistrial. In his opening brief, the defendant concedes that "one may only speculate that the prosecution was either seeking delay or some other advantage in having a mistrial declared".[10]

For the reasons that we have already outlined, there was a manifest necessity for the *sua sponte* declaration of a mistrial by the Superior Court. The record does not support Bailey's contention that the prosecutor's final line of questioning was motivated by bad faith or intended to cause a mistrial. Under the circumstances of this case, the double jeopardy clauses of the State and Federal Constitution provide no bar to Bailey's retrial and neither does the applicable Delaware statute.[11] Cf. *United States v. Perez*, 22 U.S. 579; *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083.

## SPEEDY TRIAL

The defendant's second argument is that he was denied his right to a speedy trial under the Sixth Amendment to the United States Constitution and Article I, Section 7 of the Constitution of the State of Delaware. He contends that the delay from June 11, 1978, the date of his arrest, to April 1, 1985, the date of his trial, denied him a speedy trial. A defendant has the same right to a speedy trial under Article I, Section 7 of the Delaware Constitution that he has under the Sixth Amendment to the United States Constitution.[12] Therefore, our analysis of Bailey's State Constitutional challenge mirrors that of his Federal claim. See *Fensterer v. State*, Del.Supr., 493 A.2d 959 (1985) and *Shockley v. State*, Del.Supr., 269 A.2d 778 (1970).

What constitutes a speedy trial varies depending upon the facts of the individual case. *Stacey v. Delaware*, Del. Supr., 364 A.2d 819, 820 (1976) (citing *Beebe v. State*, Del.Supr., 346 A.2d 169 (1975)). To determine whether a speedy trial violation has occurred, a court must use a balancing test in which the conduct of both the prosecution and defendant are weighed. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In *Barker*, the United States Supreme Court identified some of the factors to be

---

9. When the first trial was mentioned by Price, the Court asked the prosecutor if the witness had been instructed "not to go into that". The prosecutor reply was "Yes, your Honor".

10. Appellant's Opening Brief, p. 13.

11. Independent of the Delaware constitutional provisions relating to double jeopardy which are set forth in Article I, § 8, 11 *Del.C.* § 207 outlines certain circumstances under which prosecution is barred by former prosecution for the same offense. That statute provides that a subsequent prosecution is not barred if the former prosecution was properly terminated when the "trial court declares a mistrial in accordance with law" as was done in this case. 11 *Del.C.* § 207(4)(b).

12. The United States and Delaware Constitutions provide in relevant part:
 "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ..."
 U.S. Const. amend. VI. Article I, section 7 of the Delaware Constitution, using similar language, says:
 "In all criminal prosecutions, the accused hath a right ... to have ... a speedy and public trial ..."

weighed as: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.* This Court adopted such an approach in *Fensterer*, 493 A.2d at 965. We proceed then, to consider the factors enumerated in *Barker.*

■ *"The length of the delay* is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry in the other factors that go into balances." *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192. Bailey was arrested for the murder of Frank Dukes on June 11, 1978. His most recent trial, the subject of this appeal, commenced approximately seven years later, on July 1, 1985. Eighteen months of that time constituted the period between Bailey's first conviction in July 1980 and the reversal and remand of that conviction to the Superior Court in February 1982. For the purposes of analyzing Bailey's claim that he did not receive a speedy trial, the appeal period is appropriately excluded from our consideration. *See Tramill v. State*, Del.Supr. 425 A.2d 142, 143 (1980); *see also United States v. Ewell*, 383 U.S. 116, 121, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). The State concedes that the remaining period of five years and eight months [13] is facially sufficient to provoke inquiry into all the *Barker* factors. Indeed, at face value, a delay of five years and eight months causes us considerable concern. The balancing test of *Barker* having been triggered by the length of delay, we proceed with a weighing of all relevant factors. The defendant argues that his right to a speedy trial was denied by the *conduct of the state.* Given our serious concern about the magnitude of delay, we will examine the history of Bailey's prosecution in its entirety.

■ Initially, we note that since his arrest, Bailey has had four trials (three complete trials and one aborted proceeding) or one trial for every fourteen months that his case was pending in the Superior Court.

The longest single stretch of pre-trial delay was the twenty-five month period between the defendant's arrest in June, 1978, and his first trial in July, 1980. Much of the first six months was taken up with standard pre-trial activity, most of it initiated by the defendant. For instance, the defendant's suppression motion, filed in July, went to a hearing in September, required briefing in October and November, and was decided in December. The necessity for briefing and oral argument on Bailey's motions cannot be weighed against the State. "The State is not expected to surrender its meritorious legal arguments so that a defendant may be brought to trial more quickly." Cf. *Fensterer*, 493 A.2d at 965–966.

Aside from pre-trial preparation, much of the other delay prior to the first trial is also attributable to actions taken by the defendant. During that time, the defendant was represented by private counsel. While the Motion to Suppress was still being briefed in the Superior Court, Bailey's attorneys simultaneously filed a motion to have a ballistics expert appointed. Despite being represented by a private attorney, the defendant sought a Superior Court order which would have compelled the Public Defender's office to pay for or to provide free of charge to Bailey the services of a ballistics expert. This motion was also briefed and argued and Bailey's motion was *granted.* After losing the payment issue in the Superior Court, the Public Defender's office appealed to this Court in March of 1979. Following briefing and oral argument, this Court affirmed the Superior Court's original order on December 26, 1979. The prosecution was not a party to this collateral litigation and the delay it occasioned cannot be weighed against the State.

During the next six months leading up to the first trial, the defendant made several motions including one that he be transported personally to the scene of the crime and another motion to provide him with the

---

**13.** This figure is arrived at after deducting the eighteen month period which constituted the appeal period between the defendant's first conviction in July, 1980 and the reversal of this conviction and remand to the Superior Court in February, 1982.

services of a private investigator at the expense of the Public Defender. Both of these motions were granted. Bailey's first trial commenced on July 7, 1980. Prior to his first trial, Bailey did not file a motion alleging the denial of a speedy trial. Since we find that the prosecution was not responsible for any portion of the twenty-five month delay between Bailey's arrest and Bailey's first trial, any delay in the scheduling of the defendant's first trial will not weigh against the prosecution.

Having excluded the time of appeal for the first conviction, we now turn to the eighteen month delay between this Court's opinion reversing the defendant's conviction in February 1982 and the defendant's second trial in October 1983. Once again we find that the delay is attributable to the actions of the defendant. During this period, Bailey was represented by new defense counsel who sought habeas corpus relief and requested other extraordinary relief in the Superior Court as well as this Court.[14] Bailey also filed several *pro se* applications during this same time period. On May 23, 1983, a defense request for a continuance was granted *over the state's objection.* After the defense request for a continuance was granted, a fall trial date was established to accommodate the defense need for preparation.[15] On October 19, 1983, Bailey's second trial was aborted when the trial judge granted a mistrial *sua sponte* for the reasons we have already discussed. We do not find any portion of the eighteen month interval between this Court's opinion reversing Bailey's original conviction and his second trial attributable to action by the prosecution.

Eleven months elapsed between the mistrial in October of 1983 and Bailey's third trial which commenced on September 10, 1984. During this interval, new counsel was once again appointed to represent Bailey and the new defense attorney proposed September 10, 1984 as an appropriate trial date.[16] During the same interval, the trial court also addressed defense motions for a dismissal on speedy trial grounds, a defense petition for a writ of habeas corpus, a defense motion for a change of venue, and defense motions relating to bail. We find no delay during this eleven month interval that is attributable to improper conduct by the State. Bailey's third trial ended with a hung jury. A mistrial was declared and a new trial was scheduled to begin in January 1985.

Finally, we examine the eight-month interval between the defendant's third and fourth trials. During this interval, once again new attorneys were appointed for Bailey. A defense motion for a change of venue to New Castle County was granted. A defense motion for a continuance from January 1985 to March 1985 was granted. The defense filed a motion for a reduction of bail, a petition for a writ of habeas corpus, and a motion to hire an investigator. The motion to hire an investigator was granted. A defense motion to visit the crime scene was granted. A hearing on a defense motion for a Rule to Show Cause was held on March 29th. However, a defense motion for a continuance on March 29, 1985 was denied. Again, we find no cause of delay during this eight-month interval that should be weighted against the prosecution.

In a speedy trial analysis, *the reason for delay* has been called the "flag all litigants seek to capture," because it is here that the speedy trial argument usually stands or falls. *United States v. Loud Hawk*, 474 U.S. 302, ——, 106 S.Ct. 648, 655, 88 L.Ed.2d 640, 654 (1986). Our exhaustive review of this case leads to the conclusion that Bailey has failed in his quest to capture that flag. We find no reason for delay that is properly weighted against the State.

---

**14.** Prior to Bailey's second trial, this Court dismissed an appeal on November 8, 1982 and dismissed a subsequent appeal on February 16, 1983.

**15.** Bailey's second trial was scheduled to begin in March of 1983 but was rescheduled for October of 1983 when the defense requested a continuance because it was not prepared for trial.

**16.** Bailey's new defense counsel wrote to the Superior Court on May 31, 1984 suggesting the trial date of September 10, 1984.

The third factor in the speedy trial analysis is the *defendant's assertion of his right.* If and when a defendant asserts his rights are factors of considerable significance in determining whether there has been a speedy trial violation. *See, e.g., Whalen v. State,* Del.Supr., 492 A.2d 552, 568–69 (1985). Both factors are entitled to strong evidentiary weight. *Id.* Bailey first asserted a claim that he was being denied a speedy trial after his original conviction was reversed.[17] The defendant also filed subsequent motions alleging the denial of a speedy trial prior to his third and fourth trials. The record does not support Bailey's contention that he filed a speedy trial motion *prior* to the proceedings that led to his original conviction. We find that Bailey's failure to raise his speedy trial claim prior to his first trial is not determinative in our analysis because we find that his subsequent motions alleging the denial of a speedy trial were timely.

We also find, however, that Bailey's assertion of his speedy trial claims are reminiscent of Penelope's Tapestry.[18] Cf. *United States v. Loud Hawk,* 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640. At the same time Bailey was making a record of claims in the Superior Court alleging the denial of a speedy trial, he was also filing with the Superior Court and with this Court motions and requests for interlocutory appeals and other extraordinary relief, *pro se* and through counsel that materially added to any delay in scheduling his various trials. Although the record reflects that Bailey has repeatedly moved for a dismissal on speedy trial grounds, that finding alone does not establish that Bailey has appropriately asserted his right. Cf. *United States v. Loud Hawk,* 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640. When we examine Bailey's speedy trial motions in the context of

the history of this case, i.e., the filing of motions, petitions, and interlocutory appeals, we conclude that Bailey made a conscientious choice to conduct his defense along alternative lines, some of which were mutually inconsistent with his announced desire to have a speedy trial.[19]

The fourth and last factor which we consider in a speedy trial analysis is *prejudice to the defendant.* In *Fensterer,* this Court explained that prejudice "should be assessed in light of the interest of the defendant which the speedy trial right was designed to protect." *Fensterer,* 493 A.2d at 966, quoting *Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct. at 2193. These interests were: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize the anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* The defendant did not raise any arguments under the first two interests. Even so, we shall address all three.

Except for the period July 22, 1980 to January 20, 1982, when Bailey was serving a sentence for the conviction that was subsequently overturned by this Court, Bailey remained incarcerated in default of bail or held without bail from the time of his arrest. During the entire course of his incarceration, the record reflects that Bailey was ineligible for bail or unable to raise bail. His various motions for a reduction in bail or a certificate of reasonable doubt were considered carefully and often. We do not find the circumstances surrounding Bailey's pretrial incarceration to have been oppressive.

The second prejudicial interest which the speedy trial right was designed to protect, "the anxiety of the accused, is to some

---

17. The record reflects that Bailey's attorney first filed a speedy trial motion on February 22, 1982. The initial speedy trial motion was denied. The denial of that motion was appealed to this Court and that interlocutory appeal was dismissed for lack of jurisdiction.

18. Homer, Td Oddessy, Brooks II, Lawrence 91–105 (R. Lattimore trans. 1965).

19. As an example of this alternative inconsistent conduct, we note that on February 9, 1983 Bail-

ey moved to dismiss his case on speedy trial grounds. When that motion was denied, Bailey filed a request for a continuance on March 1, 1983 that ultimately resulted in an October 1983 trial date. A second example is also noted. After a mistrial was declared in October 1984, a new trial date of January 21, 1985 was set. On January 10, 1985, Bailey filed a request for a continuance that was granted.

extent present in any case." *See Fensterer*, 493 A.2d at 966. There is no reason in the record to indicate that the defendant suffered any more anxiety than any other person charged with first degree murder. *Id.*

The final interest relating to prejudice which the speedy trial right was designed to protect and limit is the possibility that the defense will be impaired by delay. In support of his claim of prejudice to his defense, Bailey objects *inter alia* to the fact that the trial judge did not approve the last request for the hiring of a private investigator until two weeks before his fourth trial, that trial judge denied Bailey's final request for a continuance, that trial preparation materials were allegedly taken from Bailey's prison cell shortly before trial, and that several of Bailey's telephone conversations with his attorneys were limited in time. These claims of prejudice are not logically related to Bailey's claim that he was denied a speedy trial.

However, Bailey does claim that because of the amount of time that elapsed between his arrest and his fourth trial, certain defense witnesses could not be located. Bailey concedes that the testimony of these witnesses from his first trial was available to be read into the record, and he has articulated no reason to believe that had they been available at his fourth trial their testimony would have changed in any way. Although we recognize the fact that live testimony by a witness is often preferable, the fact remains that the sworn testimony of all witnesses from Bailey's first trial had been preserved and was available for presentation to the jury at his fourth trial.[20] Therefore we find that there was no prejudice to Bailey's defense that is attributable to the delay in trial.

After an examination of all of the factors that we must consider to determine wheth-er a speedy trial violation has occurred, we must weigh and balance them. We conclude that the balance tipped against Bailey. We have found the delays in Bailey's case directly attributable to the manner in which he conducted his defense. Many of Bailey's motions were successful, some of his motions were repetitive but all were a conscious exercise by Bailey of the procedural rights afforded to him by our judicial system. We have found no demonstrable or appreciable prejudice to Bailey's ability to ultimately present his defense at his fourth trial. Cf. *Fensterer v. State*, 493 A.2d at 967.

## INTERFERENCE WITH COUNSEL

The defendant's next argument is that as a result of State interference, he was denied his Sixth Amendment Right to effective assistance of counsel. Specifically, Bailey contends that prison officials interrupted his telephone calls with his attorney and destroyed materials that Bailey had prepared to present to his attorney prior to his fourth trial for the purpose of trial preparation.

The right of an accused person to have the assistance of counsel for his defense is fundamental to our system of justice and is meant to assure fairness in the adversary criminal process. *Gideon v. Wainwright*, 372 U.S. 335, 342–344, 83 S.Ct. 792, 795–797, 9 L.Ed.2d 799 (1963). The denial of the assistance of counsel to a criminal defendant is a denial of due process of law, under both the federal and Delaware Constitution. *Merritt v. State*, Del.Supr., 219 A.2d 258 (1966). Courts have been responsive to proven claims that certain governmental conduct has rendered counsel's assistance to the defendant ineffective. *See Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). However, without detracting from

---

**20.** The Delaware Uniform Rules of Evidence provide in D.R.E. 804(b)(1): "Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(a) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination."

the fundamental importance of the right to effective assistance of counsel in criminal cases, the necessity of preserving society's interest in the administration of criminal justice has also been recognized. In the absence of demonstrable prejudice, or the substantial threat of prejudice, the dismissal of an indictment against an accused has found to be inappropriate even though there may have been a deliberate interference with the right to counsel. Cf. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) *reh. den.* 450 U.S. 960, 101 S.Ct. 1420, 67 L.Ed.2d 385 (1981). Situations involving interference with the assistance of counsel are subject to the general rule that the remedy should be tailored to the injury suffered and should not unnecessarily infringe upon society's competing interest in the administration of criminal justice.[21] Cf. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665. With these parameters in mind, we examine the facts, circumstances, and rulings of the trial court in the present case. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), *reh. den.* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967).

■ Prior to his fourth trial, not only did Bailey remain incarcerated, but he was placed in the maximum security unit at the Delaware Correctional Center. Bailey alleged that confinement in the maximum security unit impeded his ability to prepare for trial. In fact, Bailey filed a motion to be removed from the maximum security unit. On March 12, 1985, the Superior Court denied Bailey's motion to be removed from the maximum security unit but entered a detailed order permitting Bailey unlimited access to his attorney, free access to writing and legal material necessary to assist his attorney and liberal telephone privileges for discussions with his attorney.[22] Problems concerning the implementation of the Superior Court Order arose almost immediately. On March 22 and March 23, 1985, Bailey personally sent two letters to the Superior Court Judge alleging that legal papers relating to the preparation of his defense had been taken, that he been denied unlimited access to a telephone to speak with his attorney and that on one occasion prison officials had interrupted his phone call with his defense counsel. Bailey's attorneys reiterated his *pro se* concern on March 25, 1985 by filing a motion to dismiss the charges due to the State's interference with the preparation of the defendant's case and by also filing a petition for a rule to show cause to be issued against a correctional officer for removing legal documents and other legal materials from Bailey's prison cell. These motions were of such concern to the Superior Court that a hearing on the motions was scheduled for March 29, 1985, with the defendant present.

At the hearing on March 29, 1985, Bailey testified that legal papers necessary for the

**21.** A review of several relevant cases demonstrates how a remedy has been fashioned to meet the injury. When one defendant was totally denied the assistance of counsel at his criminal trial, his conviction was reversed. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792. When incriminating information has been obtained from a defendant who was not represented, the remedy has often been to suppress the evidence. *See Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199. In some situations, questions have even arisen about whether or not certain violations of the right to counsel might be disregarded as harmless error. *Compare Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977).

**22.** Defendant's Motion for Removal from Maximum Security to Medium II of the Delaware Correctional Center having been heard and denied,

IT IS HEREBY ORDERED:

1. Defendant, Coy E. Bailey, Jr., shall be permitted to see his attorneys at any time and, further, that in the presence of said attorneys, he shall be free of handcuffs and shall be allowed to bring into the conference room with said attorneys any and all legal materials so desired; writing materials, pens, and pencils.

2. Defendant, Coy E. Bailey, Jr., shall at all times have free access to pens, pencils, writing tablets and legal materials necessary to assist his attorneys in the preparation of his defense.

3. Defendant, Coy E. Bailey, Jr., shall be allowed liberal telephone privileges for discussions with his attorneys. Said telephone calls shall not be limited to any specific time span and while on the telephone with said attorneys, Mr. Bailey shall be free of handcuffs so that he may write notes necessary to assist in the preparation of his defense.

preparation of his defense had been taken during a routine "shakedown" i.e. a prison cell inspection to search for contraband. Bailey also testified that the Court order granting him access to legal materials, that had been posted on his prison cell wall, had been torn down. According to Bailey, the trial preparation materials which were not missing had been scattered on the floor of his cell by correctional officers. Bailey also testified that despite the Superior Court order, he was not given unlimited telephone access to his lawyer and that on one occasion, prison officials had interrupted a telephone conversation between Bailey and his defense counsel. The correctional officer who performed the "shakedown" was called by Bailey to testify. That officer specifically denied removing any papers. At the conclusion of Bailey's presentation on March 29, 1985, the State, without presenting any independent evidence requested the Superior Court to deny Bailey's motion and to deny Bailey's petition.

The Superior Court concluded that even if there "had been some disappearance of materials from Bailey's prison cell, it was not unknown material and could presumably be resurrected or reassembled in a useable form within one week." The court ruled that it was "not persuaded there should be a dismissal of the action based on what I heard or there should be a rule to show cause issued or that the case should be continued". However, immediately following that ruling, the Superior Court made it clear to the State that photographs previously requested by Bailey should be delivered to him immediately to assist him in preparation for trial, and that the Court itself had already talked to prison officials to make sure there would not be a problem in getting Bailey's "sketch pad" returned. The Court was also assured by the prosecutor that Bailey's telephone calls to counsel would not be cut short by the prison officials.[23] Finally, the Court put the State on notice that if there were any more problems "along those lines" that the Court would give serious consideration to the issuance of a contempt citation. Finally, the Court recognized Bailey's and Bailey's attorneys vested interest in the manner in which they presented the defense.[24]

We find that the manner in which the trial judge handled Bailey's claim of interference with counsel was exemplary and a model for the consideration of similar claims in the future. The Superior Court began its evaluation of Bailey's claim by not only expressing grave concern about the serious nature of the allegations but by promptly scheduling a hearing on Bailey's motion and petition. Bailey was present at the hearing, testified personally, and called witnesses to testify in support of his position. The testimony of the witnesses conflicted. The trial court resolved the conflicting testimony contrary to Bailey and denied his applications. This court has held that it will not disturb conclusions of fact made by a trial judge that are supported by competent evidence. *State v. Rooks,* Del.Supr. 401 A.2d 943, 949 (1979). *See also State v. Rooks,* Del.Supr. 411 A.2d 316. Moreover, even though the Superior Court denied Bailey the specific relief that was requested (a dismissal or a contempt citation) the trial court properly assessed the prejudice to Bailey and fashioned a remedy which was appropriate to the injury Bailey had sustained. The Court found that material had, in fact, disappeared but could be resurrected or reassembled in a short time and without undue prejudice. Thereafter, the Court specifically ordered the State and the officials of the correctional institution to comply with the prior order of the Court and take immediate action to return Bailey's materials to him and to guarantee Bailey unrestricted access to his

---

23. The prosecutor quite properly recognized her affirmative duty to take steps to make sure that Bailey's right to counsel was not violated by prison personnel and that the terms of the Superior Court Order were honored.

24. Let's assume Mr. Bailey is a very difficult prisoner—I don't know that he is—but let's assume it for purposes of discussion—this is a murder case, he's in custody, he's in maximum. What more can he do? He's entitled to have some ability to present his case in the manner in which he would like to present it. Let's get about the business of doing it.

attorney or be held in contempt. Cf. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665.

Bailey argues that although he was able to reconstruct most of the material that had been damaged or destroyed, the fact that the occurrence took place only one week before trial frustrated him in the preparation of his defense. Specifically, Bailey argues that he was unable to adequately assist his attorney without the written material, thereby causing his attorney to be unprepared for proper cross-examination of State's witnesses and proper direct examination of defense witnesses. The record reflects that this concern was made known to the Superior Court before the trial commenced. The trial court indicated a willingness to grant the defense additional time or preparation during the course of the trial, if such a need became evident.[25] Once again, the trial judge wisely fashioned a remedy to meet the need which was identified. The record does not reflect that the defense requested any additional time for preparation during the course of the trial.[26]

 In the absence of demonstrable irreparable prejudice, dismissal of an indictment is inappropriate, even though there has been interference with the right to be assisted by counsel. Cf. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665. The trial court in this case concluded that some material had disappeared but that the defendant was not unduly prejudiced. We are concerned and do not condone interference with a defendant's right to counsel by prison officials or correctional officers. We are particularly concerned about the alleged conduct in this case which can only be characterized as egregious if it occurred despite the entry of a specific order by the Superior Court to protect Bailey's right to effective assistance of counsel. However, we find that the solution of the Superior Court was appropriate and its willingness to enforce its orders through its contempt powers entirely justified. We affirm the Superior Court's decision not to dismiss the charges against Bailey on the grounds that he was denied the effective assistance of counsel due to State interference. We find that the Superior Court's conclusions and corrective action were proper and are supported by the facts in the record.

### DENIAL OF REQUEST FOR CONTINUANCE OF TRIAL

At the conclusion of the hearing on March 29, 1985, the Superior Court not only denied Bailey's request to dismiss the charges against him and declined to issue Bailey's petition for a Rule to Show Cause but also denied Bailey's request that his case should be continued. The request for a continuance by Bailey was raised orally, for the first time, at an office conference to discuss Bailey's written motions. The Superior Court reserved decision on all of the defense motions until the hearing on March 29, 1985 had been completed. At the conclusion of the March 29, 1985 hearing, the trial court asked Bailey's defense attorneys if the request for the continuance was still viable. The following exchange took place:

"MR. RAMBO: Yes, your Honor.

I would suggest they're viable.

I would particularly suggest that the request for a continuance is viable and in view of the fact that Mr. Bailey has alleged that there's been the kind of interference that would preclude his adequate defense.

He's had significant notes that have taken him hours and hours to put together for counsel and those notes, particu-

---

**25.** "THE COURT: My understanding is that the State's case will take, at a minimum, four days, which probably will use up our first week by the time we pick the jury and all.

I would propose to start on Monday and proceed forthwith. If, in the course of the proceedings, it becomes evident that the defense needs additional time because of what we've been hearing about, the Court will consider it."

**26.** One of Bailey's claims had been that some of the materials that was missing from his cell would interfere with his attorney's ability to cross-examine Michael Sponaugle. The trial record reflects that the cross-examination of Sponaugle covered over one hundred pages of transcript and that there was no application to the trial court for additional relief because of any inability to prepare for that cross-examination.

larly in view of the fact that back up counsel, if you will, most recently into the case, which would be of assistance to me, I should say particularly.

There's a lot of material early involved in preparation for trial and it was probably three or four weeks ago that I was made aware of the fact that I would be attending trial.

So with regard to the references he made to the Sponaugle testimony, I would say that the defendant feels that testimony is more relevant than I thought they were, so I would suggest that his request for a continuance would certainly be reasonable for that reason alone, if not for the other stated, and I will not get into the sketch pad because that speaks for itself.

I would also advise the Court that we thought after our conference down state that we will have access now to certain pictures that could be presented to Mr. Bailey for his use in doing those drawings that we've asked him to do, and I don't think the pictures are done today yet.

MISS BRADY: They're done.

It's my understanding they weren't done when I left Dover for me to bring up with me.

Defense counsel met with the chief investigating officer, who happens to be the head of SBI, the State Bureau of Identification and in charge of the Photographic Unit. They met Wednesday and selected photos for eight-by-ten copies to be made and they were worked on yesterday and this morning, and I believe are probably done now, but not in time for me to bring to Wilmington with me.

THE COURT: When you ask for a continuance, Mr. Rambo, how long are you talking about?

MR. RAMBO: Well, I think what Mr. Bailey has indicated, your Honor, is that these things are things you can't do within a couple of hours.

THE COURT: Name your price.

Are you talking about one day, two days, a week, a month?

MR. RAMBO: I think he's talking about a week, your Honor.

THE COURT: Miss Brady, what's your position?"

The prosecutor objected to the request for a continuance. The State's objection was based primarily upon problems in scheduling witnesses. Bailey's attorney indicated a willingness to permit the State to call witnesses out of turn and even to permit the State to call witnesses during the course of the defendant's case. The prosecution declined to accept the latter offer. After considering the respective positions [27] with respect to the request for a continuance, the Court issued the following ruling:

"THE COURT: My understanding is that the State's case will take, at a minimum, four days, which probably will use up our first week by the time we pick the jury and all.

I would propose to start on Monday and proceed forthwith. If, in the course of the proceedings, it becomes evident that the defense needs additional time because of what we've been hearing about, the Court will consider it.

I say that, having in mind that even assuming there's some disappearance of material, it is not unknown material and it can be presumably resurrected or reassembled in useable form by next week, so I am not persuaded that we're in a

---

**27.** In his opening brief Bailey complains that as a result of the trial judge's refusal to grant the requested continuance, he, Bailey, was forced to go to trial without certain witnesses who, Bailey says, were essential to his defense and whom he could not locate prior to the April 1 trial date. Appellant's Opening Brief at 22–24. Even if this position was initially presented to the Superior Court orally on March 28, 1985, the record is clear that this reason for a continuance was not presented to the trial judge when the motion for a continuance was renewed on March 29th and, consequently, was not considered by the trial judge in denying Bailey's continuance request. Therefore, this basis for challenging the denial of Bailey's request for a continuance may not now be presented for review. Supreme Court Rule 8. Our review is limited to the reasons presented for a continuance that were ultimately made to the trial court on March 29, 1986 before a final decision was rendered.

position where it just would unduly prejudice the defendant to put the case off for a week.

To put it off at this juncture, not only inconveniences the State, it may cause all kinds of problems on witnesses and it may mean the defendant may not get around to figuring out the witnesses for the defense, but last, perhaps not least, it certainly would inconvenience the Court.

We're in a schedule crisis from day to day and when you put aside cases like this, even for a week, it causes a lot of turmoil.

I am not persuaded there should be a dismissal of the action based on what I heard or there should be a Rule to Show Cause issued or that the case should be continued."

■ This Court has held that applications for continuances are left to the discretion of a trial judge whose ruling will not be disturbed on appeal unless that ruling is clearly unreasonable or capricious. *Riley v. State*, Del.Supr. 496 A.2d 997, 1018 (1985), *cert. den.* —— U.S. ——, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). In *Riley*, we also concurred with the observation of the United States Supreme Court that "there are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 850, 11 L.Ed.2d 921, *reh. den.* 377 U.S. 925, 84 S.Ct. 1218, 12 L.Ed.2d 217 (1964). In *Riley* this Court held that in reaching a decision on whether to grant a continuance, the trial court should consider the reasons advanced by the defendant as well as the circumstances of the case. The circumstances of the present case and the reasons presented to the trial judge at the time Bailey's continuance request was denied demonstrate that the trial judge properly exercised his broad discretion in this area.

In support of the request for a continuance, Bailey's attorney alleged that State interference with Bailey's right to counsel by the State resulting in the disappearance or damage of certain legal materials would preclude Bailey from properly presenting an adequate defense. In support of this position, Bailey relies upon our decision in *Merritt v. State*, Del.Supr., 219 A.2d 258 (1966). In *Merritt* we held that the trial court abused its discretion in denying a request for a continuance when new counsel was appointed on the day of trial and only given thirty minutes to consult with the defendant before the trial commenced. Bailey's situation is quite different. The attorneys representing him at his fourth trial were appointed several months before trial on December 6, 1984. Their original request for a continuance was granted and Bailey's trial date was continued from January 21, 1985 to March 11, 1985. The ultimate date set for that trial was April 1, 1985. Not only did Bailey's attorneys have several months to prepare for trial but their motion to hire a private investigator was granted on March 18, 1985 and their motion to permit the defendant to visit the crime scene was granted on March 21, 1985. The only issue before the Superior Court on March 29, 1985 vis-a-vis a continuance related to the missing trial materials. After a full and complete hearing, the court concluded that even if there had been "some disappearance of material, it is not unknown material and it can be presumably resurrected or reassembled in reuseable form by next week, so I am not persuaded we are in a position where it just would unduly prejudice the defendant to put the case off for a week."

Assuming that the defendant's request for a continuance was not directed solely at the problem caused by the missing legal materials and assuming that it also encompassed all possible problems, the defense request for a continuance was limited to a postponement of the trial for one week. The trial court found that a great deal of turmoil would be created even if the case was only put off for one week. However, in concluding that the request for a continuance should be denied and that the trial should commence as scheduled, the Court also ruled that "if in the course of the proceedings, it becomes evident the defense

need additional time because of what we've been hearing about, the Court will consider it." There is no indication in the record that the request for a further continuance or additional time was renewed during trial.

In reaching its decision to deny Bailey's request for a continuance of one week, the trial court clearly considered the reasons advanced by the defendant for the continuance as well as the circumstances of the case. Cf. *Riley v. State*, 496 A.2d 997. In weighing the relevant factors, the trial court did not preclude a subsequent request for a continuance—during the course of the trial—by Bailey, but, in fact, invited such a request if Bailey's attorneys found it necessary. Broad discretion must necessarily be given to trial courts on matters concerning the grant or the denial of a continuance. Given the circumstances under which the request for a continuance was made, the court's handling of the request was entirely reasonable and appropriate. Cf. *Riley v. State*, 496 A.2d 997. *See also Raymond Heartless, Inc. v. State*, Del.Supr. 401 A.2d 921 (1979) and *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841.

## STATE'S FAILURE TO PRESERVE EVIDENCE

The defendant alleges that his right to due process of law was violated as a result of the State's failure to preserve certain evidence. At trial, defense counsel moved for a judgment of acquittal on three alternate grounds. The second and third grounds related to the State's failure to preserve certain evidence. The specific allegation at trial was:

"The second allegation has to do with the State's failure to preserve certain evidence which we believe that, under *Brady*, may have turned up evidence favor-

able to the defendant. That is a Pepsi can—it has been testified that it was recovered—is not in evidence. The paper bag in which the gun was enclosed has been lost and the metal bucket, which allegedly was used to cover up blood, was never taken into evidence.

The third and final area, Your Honor, is that the State's failure—failed to look into the allegation that a third party, who may have been an eyewitness to the shooting, was neither verified nor investigated and that also, Your Honor, has prejudiced—it's prejudiced the defense.

THE COURT: Can you elaborate a little on that? I don't understand what you're—

MR. FIGLIOLA: Your Honor, Sergeant Collison, in his original statement, made reference to a third person running through the woods. He has tried to explain that away to mean that he was referring to the deceased, Frank Dukes. The way it was presented in a statement, Your Honor, we do not feel that that is a proper explanation; that we feel that there probably was a third person running through the woods and that the State was negligent in not investigating that allegation.

That's it, Your Honor. For that reason we would ask for a judgment of acquittal in this case." [28]

■■■■ There is no question that the State has a responsibility to disclose exculpatory evidence to a defendant upon request. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Otherwise, the State could purposely withhold such evidence resulting in at the very least, an unfair trial if not an unjustified conviction.

---

28. On appeal, Bailey also alleges that the State failed to preserve evidence by not taking a photograph of the area immediately behind Sponaugle's house during the course of its original investigation. Bailey makes no reference to any portion of the record which would support a finding that his present concern about the failure to take a photograph was ever presented to the trial court. In fact, in the statement of facts set forth in Bailey's opening brief, the only reference to the State's failure to preserve evidence is a citation to the ruling by the trial court relating to the "Pepsi can," the paper bag in which the murder weapon was enclosed and the metal bucket which was allegedly used to cover up the blood. Given Bailey's failure to raise the issue of the photograph at the trial level, it cannot be raised on appeal. Supreme Court Rule 8.

Such a possibility would be manifestly unfair and will not be tolerated. The Rules of the Superior Court, e.g. Rule 16, obligate the State. to produce items and have no *Brady* limitation that the items be exculpatory. The State's duty to disclose evidence under *Brady* or by Superior Court Rule also includes a duty to preserve it. *Deberry v. State*, Del.Supr., 457 A.2d 744 (1983).

In an effort to provide a meaningful opportunity for criminal defendants to present a complete defense, the United States Supreme Court has developed "what might loosely be called the area of Constitutionally guaranteed access to evidence." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). However, without detracting from the guarantees of the Federal Constitution, in a recent concurring opinion, Justice O'Conner noted that rules concerning preservation of evidence are generally matters of state, not Federal Constitutional law. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

This Court has long been cognizant of its role in the "access to evidence" area. In *Deberry*, this Court held that the State's failure to produce or account for the defendant's clothing, which the defense had requested the State to produce, was reversible error. *Id.* This Court has also found that in addition to preserving evidence, *the State has a general duty to gather evidence.*[29] *Hughes v. State*, Del.Supr., 490 A.2d 1034, 1049 (1985).

 When a defendant claims that the State has failed to preserve evidence by losing it after it has been gathered, the analysis which a Court must follow is set forth in *Deberry:*

"(1) would the requested material, if extant in the possession of the State at the time of the defense request had been subject to disclosure under Criminal Rule 16 or *Brady?* (2) if so, did the government have a duty to preserve the material? (3) if there was a duty to preserve, was the duty breached, and what consequences should flow from a breach?"

*Deberry v. State*, 457 A.2d at page 750.

The same analysis is applicable when the claim is made that the government had a duty to preserve the material by *gathering* it and failed to do so. For the purpose of considering Bailey's contentions, we assume arguendo that the materials he identified at trial would have been subject to disclosure under Criminal Rule 16. We also assume that the State had a *duty to gather and preserve* those materials. Having made these assumptions, we must make a determination about the consequences which should flow from the State's breach of its duty, if any. In *Deberry*, we recognized that the remedy fashioned by the Court should adequately address the prejudice to the defendant from the government's failure to preserve or gather the missing material.[30]

 In *Deberry*, our analysis of the prejudice to the defense focused on the loss of evidence by the State. In situations where the defense alleges that it has been prejudiced by the State's failure to gather or preserve evidence *ab initio*, we adopt the same flexible approach. In situations where the defendant alleges prejudice because the State failed to *preserve or gather* evidence, the following factors should be

---

**29.** This Court has consistently declined to explicitly prescribe what administrative procedures are necessary for the Attorney General and the various law enforcement agencies in this State to fulfill its duties to gather and preserve evidence. *Deberry v. State*, 457 A.2d at 752. As a matter of prudence, agencies should create rules for gathering and preserving evidence that are broad enough to include any material that could be favorable to a defendant. Cf. *Deberry v. State*, 457 A.2d at 752. Although we have left it up to the various investigative agencies to draft rules that are suited to their own methods of operation, those rules are sub-

ject to independent judicial review to determine their adequacy.

**30.** In *Deberry*, we held that "because the State must bear the responsibility for the loss of this evidence, and the defendant thereby enjoys the inference that evidence of the clothing would be exculpatory in nature, in a retrial, the State must stipulate that if Deberry's clothing was introduced, it would not contain any evidence incriminating to him." *Deberry v. State*, 457 A.2d at 754.

considered: (1) the degree of negligence or bad faith involved (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available [31], and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction. Cf. *Deberry v. State*, 457 A.2d at 752. An application of the balancing test to the allegations that Bailey raised at the trial concerning the State's failure to gather and to preserve evidence, leads to a conclusion that all of defendant's claims are without merit.

■ The first item we address is the "Pepsi can". A corollary to the duty of the State to produce evidence is the requirement "that the defendant specifically designate the tangible items sought by the defendant and controlled by the State." *Hughes v. State*, Del.Supr. 490 A.2d 1034, 1049–50 (1984). Superior Court Criminal Rule 16 has always provided that the defendant may inspect, copy, photograph, etc. tangible objects within the possession, custody, or control of the State, upon a showing that the items are material to the preparation of the defense and the request is reasonable.[32] *See State v. Winsett*, Del. Supr., 200 A.2d 237 (1964) and *State v. Traenkner*, Del.Super., 314 A.2d 202 (1973). The right of inspection that is afforded to defense counsel is important. During an inspection, defense counsel may find the basis for additional motions or may find evidence that can be properly used as a sword or a shield in the defendant's case, even if the evidence is not technically exculpatory. The record in this case shows that the State had gathered several items, including the Pepsi can, which the defense had not asked to inspect.

Defendants have often complained that it is impossible to specifically designate tangible items for inspection because it is impossible to know what to ask for without knowing what has been gathered. In *Deberry*, the initial pretrial defense discovery request was for a *"list* of all books, papers, documents, or tangible objects in the possession of the State pursuant to its investigation of the above-captioned case." In *Deberry*, we assumed that the defendant "intended to use this list to prepare a subsequent discovery request, specifying as required by Rule 16(b) the particular items he wished to inspect or copy." A request to *list* all tangible evidence gathered at the crime scene would have been reasonable and material to the preparation of any defense for Bailey. In this case, the defendant never made a pretrial request that would arguably require the State to *list* or produce the Pepsi can. If such a request had been made, the Pepsi can would undoubtedly have been identified and produced, since the State had not only preserved it but had it in its possession at trial.[33] In fact, during the course of the trial, the Court ruled that defense counsel was free to use the "Pepsi Cola can" which was readily available.

■ The Superior Court made the following ruling with respect to evidentiary questions raised by Bailey concerning

---

**31.** This variation on the factors in *Deberry* is in no way to be construed to minimize the importance of the *missing evidence* as the primary focus of the inquiry. In fact, it is consistent with our holding in *Hughes v. State*, 490 A.2d 1034 at 1050, that it was harmless because the State's failure to gather certain cigarette butts, there was independent secondary evidence of the cigarette butts contained in photographs that were available.

**32.** "Superior Court Criminal Rule 16(b) provides in part: Other Books, Papers, Documents or Tangible Objects. The defendant may serve upon the Attorney General a request to permit the defendant or someone acting on his behalf to inspect and copy or photograph designated books, papers, documents, tangible objects, buildings or places, copies or portions thereof which are within the possession, custody or control of the State, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable...."

**33.** "MS. BRADY: ... Failure to preserve the evidence, Your Honor, the Pepsi can, had Defense requested—it is in the State's possession. We have it downstairs, as we have a number of other items of evidence that haven't been introduced here today, and there's been no indication that the Pepsi can is in any way relevant to the matter before the Court.

THE COURT: In any event, you have it?
MS. BRADY: Yes."

items that were either never gathered or not preserved:

> On the items that were not preserved by defense allegation, one of them apparently is available and you're free to use it if you wish to, the Pepsi-Cola can.

> The paper bag and the metal bucket, both items—and I raise this question as to whether they weren't ruled upon the last time, and my memory was further refreshed by Miss Brady's comment. They came up more significant in the earlier rather—the reason I say significant, in the respect that there was a lot more testimony about it. I don't know of anything that we have in this case that would point to any particular significance of the paper bag or the metal bucket. I'm not even sure it was referred to at all—referred to at all in this trial.

> My recollection from the last trial is that some broken-down bucket that was in the vicinity was used as a sort of make-shift shovel, but I don't even know that it was referred to in this case in this respect. In any event, I know of nothing that—that's been presented that would indicate that the State was in some way delinquent, neglectful, in not producing these items or exploring the possibility of them as major items of evidence.

> And finally, I'm constrained to agree with Miss Brady that the explanation offered as to the third party is—has been proffered by the State on more than one occasion. Defense doesn't seem to understand it, that is that it was just made up on the spot by Collison. But what else is there? Nothing that I know of that would indicate there was a third party involved, that the State had any knowledge of a third party, and it has been denied by Collison. So that failure to investigate something that doesn't exist hardly seems a basis for dismissal or a directed verdict.

> For reasons stated in all three arguments, the motions are denied."

After a full and complete review of the arguments by the respective attorneys concerning the missing evidence [34], the Superior Court denied the defendant's motion in a manner that was entirely consistent with the applicable balancing test. First, the trial court made a specific finding that nothing had been presented that would indicate that the State was in some way delinquent or negligent in not producing the paper bag or metal bucket or "exploring the possibility of them as major items of evidence". Second, in assessing the importance of the missing evidence, the trial judge specifically ruled: "I don't know of anything that we have in this case that would point to a particular significance of the paper bag or the metal bucket. I'm not even sure it was referred to at all—referred to at all in this trial." With respect to the missing alleged eyewitness, the Court concluded that it knew of nothing which would indicate "that there was a third party involved, that the State had any knowledge of a third party," that the allegations was denied by the investigating officer and "that the failure to investigate something that doesn't exist hardly seems a basis for dismissal or a directed verdict.

The sufficiency of the other evidence produced at Bailey's trial to sustain his conviction is not reached in our present analysis since the record reflects that Bailey has failed to sustain his burden under the first two prongs of the balancing test. In reaching that conclusion, we find that the record supports the ruling of the trial judge that the State was not negligent or delinquent in gathering or preserving evidence. The trial court's finding of non-materiality is also supported by the record. Having outlined the inquiry that a trial court should make, and having examined the record in this case, our final area of focus is on the prejudice to the defendant. We find that Bailey has failed to demonstrate any preju-

---

**34.** Even if Bailey had properly preserved a right to review the State's failure to photograph the back of Sponaugle's house, the record shows that photographs and sketch pads were provided to Bailey so that he could provide reliable secondary or substitute evidence on that issue and, in fact, did produce such evidence. This secondary evidence was an acceptable alternative to the photographs that were never taken.

dice to the fairness of his trial by the manner in which the State gathered and preserved evidence. *Deberry v. State*, Del. Supr., 457 A.2d 744 (1983); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

## FAILURE TO INSTRUCT JURY ON SECOND DEGREE MURDER

The defendant's next argument is that the trial judge erred as a matter of law in not instructing the jury on a charge of second degree murder.[35] In the defendant's 1980 and 1984 trials, the jury had been instructed on the lesser-included offense of second degree murder. In 1985, the trial court prepared a draft of jury instructions that it proposed to give and distributed them to counsel for review prior to holding a prayer conference. That draft included a charge on the lesser included offense of second degree murder. During the prayer conference in the 1985 trial, defense counsel told the judge that the defendant did not want the jury charged on second degree murder. The prosecutor was also opposed to the charge on murder in the second degree. The Court agreed to delete such a charge.

The next day, defense counsel informed the trial judge that after the defendant himself had read all of the instructions, the defendant now wanted the jury to receive an instruction on second degree murder. The prosecutor continued to oppose such a charge. The trial judge concluded that there was insufficient evidence to warrant the instruction and refused to instruct the jury on second degree murder. He acknowledged that in the 1984 trial, he had given the second degree murder charge, but even then he had not been convinced "that it was fully warranted." Bailey now contends that under the principle of "law of the case" the trial judge was required to instruct the jury on second degree murder.

Rulings made by a trial court and not challenged on appeal become the law of the case. *Hughes v. State*, 490 A.2d 1034. In a subsequent retrial, the trial court's prior rulings must stand *unless* those rulings were *clearly in error* or there has been an important change in circumstance. *Hughes v. State*, 490 A.2d at 1048. During Bailey's fourth trial, no argument is made that there was any change in circumstance. Our focus, therefore, centers upon whether or not the trial court's earlier decisions to give a jury charge on second degree murder when Bailey was tried in 1980 and 1984 were clearly in error.

The contentions of the parties in this case have remained consistent. The State contends that Bailey intentionally shot and killed Dukes. Bailey's defense was not that he shot Dukes recklessly or unintentionally but that he did not shoot Dukes at all—Sponaugle did. Bailey's defense put the identity of the murderer at issue not Bailey's state of mind.

Delaware law provides that "the Court is not obligated to charge the jury with respect to a lesser included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." 11 *Del.C.* § 206(c). We find no "rational basis" in the record for the Superior Court to have charged the jury with the lesser-included offense of murder in the second degree. There is nothing in the record which would support a jury finding under the particular instruction that Bailey sought.

After a similar analysis in *Dutton v. State*, Del.Supr. 452 A.2d 127 (1982), we concluded that the case gave rise to only one of two choices: guilty of first degree murder or innocent. The evidence in Bailey's case only gave rise to the same two choices. On appeal, Bailey contends that whether or not the facts in the record sup-

---

**35.** "A person is guilty of murder in the second degree when:

(1) He recklessly causes the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life; or

(2) In the course of and in furtherance of the commission or attempted commission of any felony not specifically enumerated in § 636 of this title or immediate flight therefrom, he, with criminal negligence, causes the death of another person.

Murder in the second degree is a class A felony. (11 *Del.C.* 1953, § 635; 58 *Del.Laws*, c. 497, § 1; 59 *Del.Laws*, c. 203, § 35.)"

port a jury instruction on second degree murder, he had a vested right to have the 1985 jury receive such a charge by virtue of the "law of the case" doctrine. This contention is without merit. The law of the case principle recognizes the obligation of the trial court not to perpetuate clear error. There was no evidentiary basis for the trial court to charge the jury on second degree murder. The trial court in 1985 acted consistently with the 1982 ruling of this Court in *Dutton*. The trial court properly charged the jury with deliberating between the only two choices available from the evidence. Bailey naturally disagrees with the choice that the jury made but there was no error on the part of the Superior Court in choosing to instruct the jury as it did. Cf. *Dutton v. State*, 452 A.2d at 146.

### ISSUES RAISED PRO SE

Bailey's *pro se* "Supplemental Brief" in this appeal addresses the double jeopardy and the speedy trial issues that we have already reviewed. His arguments on those points were considered by this Court in reaching its conclusions on those questions.

Bailey has independently raised on appeal several other areas for inquiry by this Court. His initial concern relates to the grant of immunity to Sponaugle. He states that he did not have access to Sponaugle's testimony when immunity was granted originally. He also raises questions about how the immunity issue was disclosed prior to and during his 1985 trial. In particular, Bailey objects to the failure to instruct the 1985 jury specifically concerning the fact that Sponaugle had been granted immunity.

 Bailey contends that the State did not disclose the fact that Sponaugle had been granted immunity or the circumstances surrounding it in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Sponaugle was given immunity in September 1978 immediately prior to testifying at a "proof positive" hearing requested by Bailey. Bailey's attorney cross-examined Sponaugle about the circumstances surrounding the grant of immunity at the "proof positive" hearing in 1978 and again (in Bailey's presence) at the trial in 1983. Sponaugle's immunity and testimony thereon was known to Bailey and his attorneys as early as 1978. In the 1985 trial, Sponaugle testified on direct examination that he had received immunity. During the 1985 trial, Bailey's attorney cross-examined various police officers about Sponaugle's immunity.[36] In 1985, Bailey's attorneys also used Sponaugle's immunity to argue in support of a motion for a judgment of acquittal and in their closing argument to the jury.[37] The record reveals that Bailey and his attorneys knew about Sponaugle's immunity since 1978 and fully exposed and explored that issue during Bailey's 1985 trial.

In an alternative *pro se* argument, Bailey concedes that the issue of Sponaugle's immunity was before the 1985 jury and objects to the fact that the 1985 jury did not receive a specific instruction about it.[38] However, as. our early review of the instructions to the jury in 1985 reveals the trial court gave a draft of its proposed instructions to defense counsel. The instructions were reviewed with Bailey by his

---

36. "BY MR. RAMBO:
 Q. With respect to your experience as an officer of twenty years, what has been your experience with regard to the reasons given for granting immunity to a witness in a case?
 A. I've never been on a case other than this one where anyone was granted immunity.
 Q. In twenty years?
 A. That's correct.
 Q. Do you think it would be fair to say that you would grant immunity because you wanted something from that person, as a policeman?
 A. Yes."

37. "... They have the statement of one person, Michael Sponaugle. Michael Sponaugle, friend

of Corporal Taraila. Michael Sponaugle, the person who shoes Sergeant Collison's horses. Michael Sponaugle, who shortly going—after going—who shortly after going to the police was granted immunity for his testimony."

38. The jury in Bailey's 1980 trial was instructed as follows:
 "A portion of the testimony in this case is the testimony of one who's been given immunity from prosecution. This is permitted by a statute of this State. It means that the witness cannot be prosecuted in regard to the transaction about which he testifies. He remains subject to prosecution for perjury or false testimony. The fact that a witness has been granted

<sup></sup>

attorneys and strategic decisions were made concerning the form of the instructions to the jury. In 1985, there was no request for a jury instruction by the defense concerning Sponaugle's immunity and no objection to the instructions that were given as required by Superior Court Criminal Rule 30.[39] This Court has consistently ruled that in the absence of plain error, a defendant who neither objected to the instruction given or requested a different one, cannot raise the issue for the first time on appeal. *Flamer v. State*, Del.Supr. 227 A.2d 123 (1967).

In 1985, the jury *was* instructed that it was the sole judge of the credibility of the witnesses and could consider various factors in assessing their credibility including their motives, bias, prejudice, etc.[40] Under the totality of the circumstances as we have examined them, we find no error in the failure to specifically instruct the jury concerning Sponaugle's immunity. Cf. *Flamer v. State*, Del.Supr. 490 A.2d 104 at 115, 116 (1983), *cert. den. Flamer v. Delaware*, 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983); *cert. den.* — U.S. ——, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985).

Bailey raises several other issues *pro se* but those issues are mostly fairly categorized as specific examples of his allegation that his trial attorneys in 1985 were ineffective. When this Court, by order, permitted Bailey to supplement his attorney's opening brief—it specifically stated that "this Court will also not consider in this direct appeal any claims of ineffective assistance of counsel at trial, *or arguments relating thereto*. That question has been resolved by this Court's finding by Order dated May 7, 1986 that no claim of ineffective assistance of counsel having been raised at trial, the issue is foreclosed on direct appeal" citing *Duross v. State*, Del. Supr., 494 A.2d 1265 (1985).

## CONCLUSION

A criminal trial is, even in the best of circumstances, a complicated affair to manage. *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547. Bailey's trials were no exception. We find no error in the various rulings of the Superior Court. The defendant's convictions are AFFIRMED.

---

immunity is a factor which the jury may consider in judging the credibility of his testimony."

**39.** Superior Court Criminal Rule 30 provides, in part: "The Court shall instruct the jury after the arguments are completed and at such other times, including prior to introduction of evidence, as the Court may desire. Except with special permission of the Court, no party may assign as error any portion of the charge or omission therefrom unless he objects thereto before or at a time set by the Court immediately after the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

**40.** "THE COURT: Members of the jury, you are the sole judges of the credibility of each witness and the weight to be given to the testimony of each. You should take into consideration each witness' means of knowledge, strength of memory, opportunities for observation, the reasonableness of unreasonableness of his or her testimony, consistency or inconsistency of his or her testimony, the motive—motives actuating him or her; the fact, if it is a fact, that his or her testimony has been contradicted; his or her bias, prejudice or interest, if any; his or her manner or demeanor upon the witness stand and all other facts and circumstances shown by the evidence which affect the credibility of his or her testimony."