IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | § | |
| | § | No. 530, 2015 |
| Plaintiff Below- | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. 1005008059A |
| ISAIAH W. McCOY, | § | |
| | § | |
| Defendant Below- | § | |
| Appellee. | § | |

Submitted: May 4, 2016
Decided: June 28, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **VACATED and REMANDED**.

Jason W. Staib, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for Appellant.

Herbert W. Mondros, Esquire, Margolis Edelstein, Wilmington, Delaware, for Appellee.

**VAUGHN**, Justice:

The Defendant-Below/Appellee, Isaiah W. McCoy, is a pretrial detainee awaiting trial on capital murder and related charges. Using a points-based, objective risk assessment tool, the Department of Correction classified him to be held in the Secured Housing Unit ("SHU") at James T. Vaughn Correctional Center ("JTVCC"). The SHU is a maximum security setting. McCoy filed a motion in the criminal case requesting that he be transferred from the SHU to the prison's general population on the ground that detention at the SHU was interfering with his Sixth Amendment right to assistance of counsel. General Population is a minimum Level V setting. The Superior Court, over the State's objection, granted McCoy's motion, and McCoy was, in fact, transferred to general population. While McCoy had some complaints about the adequacy of the attorney visitation rooms in the SHU and access to the library, the Superior Court based its order in significant part upon its perception of "the emotional and physical impact that prolonged, solitary placement has had on [McCoy's] Sixth Amendment right to assistance of counsel . . . ."[1]

This case is one of three which the parties have identified where the Superior Court ordered a detainee transferred from the SHU to general population. The other two are *State v. Gibbs*[2] and *State v. Sells*.[3] In the first of those cases, *Gibbs,* the

---

[1] Appellant's Op. Br., Ex. A at 4.
[2] 2012 WL 6845687, at *2-5 (Del. Super. Dec. 19, 2012).
[3] 2013 WL 1143614, at *2-3 (Del. Super. Mar. 20, 2013).

1

Superior Court addressed a State contention that the Superior Court lacked jurisdiction to order a detainee transferred from one housing unit to another in a criminal case. The Superior Court found there that it had such jurisdiction under 10 *Del. C.* § 542, 11 *Del. C.* § 6504, and several cases, including the Superior Court case of *State ex rel. Tate v. Cubbage*[4] and our case of *Bailey v. State*.[5]

The State renews its jurisdictional argument here, and for the reasons set forth below, we conclude that neither the Sixth Amendment right to assistance of counsel nor the statutes and cases relied upon by the Superior Court grant it the authority to transfer a detainee from one housing unit to another in a criminal case. The order of the Superior Court is, therefore, vacated.

## I. BACKGROUND

In May 2010, McCoy was arrested and charged with the murder of James Munford in Dover, Delaware. He was convicted and sentenced to death at his first trial in June 2012. In January 2015, this Court reversed his conviction and remanded the case for a new trial.[6] Since his arrest, McCoy has been in the State's custody and has spent the majority of his detention in the SHU at JTVCC.

---

[4] 210 A.2d 555, 555 (Del. Super. 1965).
[5] 521 A.2d 1069, 1069 (Del. 1987).
[6] *McCoy v. State*, 112 A.3d 239, 271 (Del. 2015).

2

In a letter to Warden David Pierce, dated July 2, 2015, McCoy's counsel requested that McCoy be transferred from the SHU to general population. In denying the request, Warden Pierce called defense counsel and explained that "he believed that [McCoy] was being adequately housed."[7]

On July 27, 2015, McCoy filed a motion requesting that he be transferred from the SHU to general population. The motion alleged that McCoy's "detention in SHU has hindered his ability to participate in the preparation of his defense for his upcoming trial, by limiting his access to face to face meetings with his counsel and his access to the library."[8] McCoy's motion was served on the prosecutors in the criminal case, but not on the Deputy Attorney General ("DAG") assigned to represent the Department of Correction ("DOC") or anyone within the DOC.[9] The prosecutors filed a response opposing the motion, and a hearing was scheduled for August 25.

Warden Pierce of JTVCC appeared at the hearing with the prosecutors to discuss the DOC's prisoner classification policies and procedures.[10] Warden Pierce testified that the DOC classifies inmates based on an objective risk assessment analysis where a numerical value is assigned to several factors, which include: the

---

[7] *See* Appellant's Op. Br. App. at 82.

[8] *Id.* at 29.

[9] *See id.* at 36.

[10] The General Assembly created the Institutional Classification Board (the "Board"), which is a part of the DOC and is "responsible for the classification of all inmates." 11 *Del. C.* § 6527(b). The Board's classification decisions are subject to the warden's veto power. *Id.* § 6529(d).

3

charged crimes and their severity; the bond set; and the inmate's age, criminal history, and conduct while incarcerated. Warden Pierce explained that the sum of the numerical values assigned to each factor determines the classification of an individual inmate. Warden Pierce testified that McCoy was placed in the SHU because of the serious charges against him, his age, an attempted escape while serving a previous sentence, and several disciplinary infractions while detained. The total numerical value assigned to McCoy was thirty-three, which was well above the seventeen needed to be placed in the SHU.

The Superior Court then asked Warden Pierce about the DOC's policy regarding an inmate's access to defense counsel. Warden Pierce responded:

> Your Honor, since previous complaints related to counsel access, we have constructed two professional visitation rooms with face-to-face access with clients and the inmates that are housed in the secured housing unit. The policy was also changed to allow inmates to bring documents to that face-to-face interaction with their attorney, and to improve the attorneys' ability to bring electronic media, such as laptops or other items, in order to show evidence to the defendant in preparation for trial.
> The time frames are still - - they have to schedule 24 hours in advance for my facility compared to some other facilities that do not have that requirement. The reason for that being the limited space and we don't want people showing up and the space already being used. In addition to the fact that it takes time to have the inmates prepared and ready. We don't want to waste people's time by having them show up and still have to wait 10, 15 minutes until we get the inmate to the room.

4

The weekend if there is - - the policy allows for it if there was some sort of immediate need, the attorney contacts somebody. They can make a request to make an exception if there is, for example, some pending date. But in general we expect folks to schedule at least 24 hours out.[11]

In response to Warden Pierce's testimony, McCoy's defense counsel stated:

Your Honor, Mr. McCoy has been housed in the SHU for six years. What that means is he's allowed, without all the acronyms and official terminology, it means he's allowed to leave his cell for 45 minutes, three times a week.

The Court in Your Honor's opinion in *Sells* noted the severe impact on the mental state of an inmate, and the severe impact on an inmate's ability to prepare his defense under those circumstances.

We have seen that in our own representation of Mr. McCoy. I have been unable to have - - on occasion, I have had face-to-face visits with Mr. McCoy. My colleague, Mr. Wiseman, and our investigator have also had face-to-face, but we have been denied the opportunities. When we do have face-to-face, there's a lack of privacy. The security guards and the prison are able to overhear our conversations.

Being in the SHU also impedes Mr. McCoy's ability to access the law library.[12]

The Superior Court then provided McCoy an opportunity to speak. After providing an explanation regarding some of his prison conduct, he added that:

[I]t's the other things that are more important like the extra phone calls to my family. I have a daughter that turns five years old today that I've never touched. I can't touch her not because I'm

---

[11] Appellant's Op. Br. App. at A59-60.
[12] *Id.* at A64-65.

violent to staff but just because they want to leave me back there because of some system.

They have convicted murderers and convicted rapists on the compound who walk around with almost no supervision. People who have plenty of problems in the jail who walk around with almost no supervision. I feel like this is an attempt by the prison to help the prosecution in a way by - - once again, my mental state deteriorated and me not being able to help my counsel. I have been no problem whatsoever to this jail.

So I'm only hoping that I'm able to be moved to an area where I am able to move around, I'm able to play basketball, and I'm able to decompress from the ordeal that I went through being put on death row. I was on death row for over two years. That's just a situation that's very hard to explain for a man of my age. I'm only 28 years old, Your Honor. I came when I was 22.

So as I said my lawyer takes care of the legal aspect. The legal aspect is important, but it's the personal things, you know.[13]

In rebuttal, Warden Pierce addressed the law library and privacy issues:

Specifically as it relates to the law library access, all detainee inmates have correspondence access to the law library only. It's the same access Mr. Sells - - excuse me - - Mr. McCoy has to the law library is through correspondence. There are other inmates that are on the compound in medium security that also only have correspondence with the law library. That's not unique to his current housing status.

Secondly, Your Honor, as it relates to the privacy matter. The rooms that were constructed for professional visitation in the SHU great care was taken to ensure the walls were filled, the door was solid. There was a solid roof. There is an officer that has to sit outside of the secure rooms to observe for the safety of the attorney.

The attorney's requested the face-to-face. Prior there wasn't any allowed. It had to be through glass. We

---

[13] *Id.* at A67-69.

6

accommodated that, but for their safety and security, we felt it necessary to put an officer there should there be a problem, and they can see that there's a problem. Where - - the officer should be sitting themselves where they can visually see. There is a glass in the door so they can see the attorney and - -

But I've talked with the staff that supervise it. The staff have indicated that they can't hear everything that's being said in the room. Is it impossible for them to hear something if voices get elevated? Certainly not. It's not impossible, Your Honor. It's not sound proof. But that's not dissimilar to the compound professional visitation. There is a room with a glass door. Frankly even those rooms in the compound that attorneys visit their clients have additional glass. So it's less sound proof, and there are officers in that hallway also that observe what's happening. So that's not any different for the SHU versus the compound, Your Honor.[14]

No evidence was introduced at the hearing concerning McCoy's mental state, apart from his own testimony.

On August 28, the Superior Court issued its order, which directed that "McCoy is to be relocated immediately from SHU and placed in the general population of detainees awaiting trial."[15] The Superior Court emphasized that McCoy's time in the SHU "has encompassed over five years, the substantial part of which was as a presumed innocent individual."[16] Relying on *State v. Sells*,[17] the court noted the deference that it owed to the DOC's housing decisions, but explained that "the

---

[14] *Id.* at A70-72.
[15] Appellant's Op. Br., Ex. A at 5.
[16] *Id.* at 2.
[17] 2013 WL 1143614 (Del. Super. Mar. 20, 2013).

emergent picture is that [McCoy] has been in SHU for five years realistically because of the charges confronting him and very little else."[18] The court reasoned that the instances of McCoy's misconduct while imprisoned were minor, and determined that relocation was necessary to remedy "the emotional and physical impact that prolonged, solitary placement has had on his Sixth Amendment right to assistance of counsel . . . ."[19] As a result of the Superior Court's order, McCoy was transferred out of the SHU and placed in the general prison population, where he remains.

On September 1, 2015, the DOC filed a motion for reconsideration or reargument, which asserted, in part:

> The motion improperly sought (and the Order granted) mandamus relief against the DOC as part of [McCoy's] pending criminal case, notwithstanding that the DOC is not a party to the criminal proceedings and arguably has no right of appeal. . . .
> . . . .
> The Order also should be reconsidered because it was not based on a complete and accurate factual record. Due to lack of notice and other procedural infirmities, the DOC was not provided with adequate opportunity to provide the Court with documents and testimony concerning the JTVCC classification process and the reasons why [McCoy] is housed in the SHU. . . .
> . . . .
> The record also is deficient with respect to the reasons for [McCoy's] maximum security classification. . . . The Order does not mention [McCoy's] lengthy criminal history and does not address fully [McCoy's] extensive disciplinary history. . . .

---

[18] Appellant's Op. Br., Ex. A at 4.
[19] *Id.*

8

[McCoy] has a 14-page charge summary that reflects multiple prior convictions for violent felonies, including aggravated menacing, attempted robbery (1st) and possession of a weapon during the commission of a felony. The Order also does not reflect [McCoy's] escape history, which includes two prior convictions for escape from conviction. [McCoy's] disciplinary history likewise is much more extensive and troubling than suggested in the Order. Since 2010, [McCoy] has been found guilty of 20 rule violations, including 10 serious Class 1 violations. Four of the Class 1 violations were for sexual misconduct involving female correctional officers and nursing staff. . . .[20]

The Superior Court denied the DOC's motion on September 14. The court again observed that McCoy's "posture with [the] DOC is that of an individual presumed innocent while he awaits trial."[21] The Superior Court then explained that "[n]either the State nor [the] DOC was limited in any way from presenting at that Motion hearing any and all evidence it chose to present regarding [McCoy's] SHU placement . . . ."[22]

The DOC appeals from both the August 28 and September 14 orders. On appeal, the DOC makes three arguments: (1) the Superior Court lacked jurisdiction to order McCoy transferred from the SHU to general population in this criminal proceeding; (2) if the Superior Court had jurisdiction, it made legal errors in its

---

[20] Appellant's Op. Br. App. at A77-78.
[21] Appellant's Op. Br., Ex. B at 1.
[22] *Id.*

9

analysis, made improper factual findings, and abused its discretion in ordering McCoy transferred; and (3) the Superior Court abused its discretion by denying the DOC's motion for reconsideration or reargument. In response, McCoy denies each of the DOC's arguments and contends that, as a threshold matter, the DOC's appeal must be dismissed because it is an improper interlocutory appeal in a criminal case and does not fall under the collateral order doctrine. Additionally, McCoy contends that the DOC has waived its jurisdictional argument.

## II. ANALYSIS

### A. *This Appeal is Properly Before this Court Under the Collateral Order Doctrine*

Before discussing the DOC's arguments, this Court must address McCoy's contention that we should dismiss this appeal because it is an improper interlocutory appeal in a criminal case that is is outside the scope of the collateral order doctrine. We find that the appeal is within the scope of the collateral order doctrine and reject McCoy's contention.

McCoy is correct that this Court cannot hear interlocutory appeals in most criminal cases.[23] But, under the collateral order doctrine, we may hear such appeals if three conditions are met.[24] "In *Gannett,* this Court described the attributes of a

---

[23] *Gannett Co. v. State*, 565 A.2d 895, 899 (Del. 1989).
[24] *Evans v. Justice of the Peace Ct. No. 19*, 652 A.2d 574, 576 (Del. 1995).

10

collateral order comprising a final judgment: first, it determines a matter independent of the issues to be resolved in the original underlying proceeding; second, it binds a person who was not a party in the original underlying proceeding; and, third, it has a substantial effect on important rights."[25]   Applying this standard, the Superior Court's August 28 order was a collateral order this Court may review.

First, a decision by this Court will determine matters independent from the issues to be resolved in McCoy's criminal case.  The issue to be decided at trial is whether McCoy is guilty of murder and other charges.  The issues involved in that determination are wholly unrelated to the question that this decision will answer, which is whether the Superior Court has the authority to order an inmate transferred from one housing unit to another in a criminal case.

Second, this decision will bind a party that is not a party in McCoy's criminal case.  Specifically, the DOC is not a party in McCoy's criminal case, but is directly involved in this appeal.  McCoy's assertion that "the State of Delaware is a party in both the underlying proceeding and in this appeal" oversimplifies the relationship between the Department of Justice ("DOJ") and the DOC, which are distinct state

---

[25] *Id.* at 577 (citing *Gannett Co.*, 565 A.2d at 900).

11

agencies.[26] Although the DOJ is involved in the criminal case because its attorneys are prosecuting McCoy, the DOC will play no role in that prosecution.

Finally, this Court's decision will have a substantial effect on important rights. The Superior Court concluded that the Sixth Amendment right to counsel empowered it to override a DOC housing classification and order a detainee transferred to a lower level of security in a criminal case. We conclude in this appeal that it does not.

## B. *The DOC's Jurisdictional Claim is not Waived*

The DOC's first contention is that the Superior Court lacked jurisdiction to order McCoy transferred from the SHU to general population in a criminal proceeding. McCoy contends that the DOC waived this issue by not raising it to the Superior Court.

"Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented."[27] We will consider DOC's jurisdictional contention for several reasons. First, while notice of McCoy's motion was given to the prosecutors in the criminal case, McCoy did not provide any notice to the DAG assigned to the DOC, the Commissioner of Correction, or the Warden at

---

[26] For example, the DOJ is headed by the Attorney General, who is elected, whereas the DOC is headed by the Commissioner of the DOC, who is appointed by the Governor. *Compare* 29 *Del. C.* § 2502, *with id.* § 8902(a).

[27] Sup. Ct. R. 8.

JTVCC. While the warden was notified of the motion by the prosecutors and testified at the hearing on the motion, the DOC lacked the benefit of representation by the DAG specifically assigned to the DOC. The prosecutors, although part of the DOJ, are not the lawyers who represent the DOC as a client and its distinct interests. The DAG, who does represent the DOC, did not become aware of the motion until after the Superior Court held its hearing and issued its order. The better practice would have been for McCoy's counsel to serve the DAG assigned to the DOC with the motion. Second, in its motion for reargument, the DOC argued, among its other arguments, that the order should be reconsidered because it "grants mandamus relief that, by law and the applicable cases, arguably may be granted only in a separate civil proceeding,"[28] thus raising the jurisdictional question at least by implication. Third, a challenge to a court's subject matter jurisdiction is a challenge that cannot be waived.[29] This rule applies in both civil and criminal cases.[30]

To the extent there is any doubt about whether the issue was raised below, it is in the interest of justice to consider the DOC's jurisdictional contention. In deciding whether reviewing an issue is in the interests of justice, this Court considers

---

[28] Appellant's Op. Br. App. at A77.

[29] *See United States v. Cotton*, 535 U.S. 625, 630 (2002); *Plummer v. Sherman*, 861 A.2d 1238, 1243 (Del. 2004); *Sternberg v. O'Neil*, 550 A.2d 1105, 1109 (Del. 1988).

[30] *See, e.g.*, *New York v. Smith*, 494 Fed. App'x 138, 139 (2d Cir. 2012) (explaining that a procedural defect can be waived in a criminal proceeding but subject matter issues cannot).

whether resolving the issue: (1) "may have significant implications for future cases"; and "will promote judicial economy because it will avoid the necessity of reconsidering the [issue]."[31]

The interests of justice require that this Court review the Superior Court's authority to order an inmate transferred from one housing unit to another in a criminal case. Three times now the Superior Court has overridden the DOC's classification system and ordered such a transfer in a criminal case. It is important for the Superior Court and the DOC to know whether the Superior Court has the authority to do so.

C. *The Superior Court Lacks Authority to Order an Inmate Transferred from One Housing Unit to Another in a Criminal Proceeding*

Because the question presented is one of law, our review is *de novo*.[32] In *Gibbs,* the Superior Court identified two statutes which it believed gave it the authority to order an inmate transferred from one housing unit to another in a criminal case: 10 *Del. C.* § 542, which gives the Superior Court "full power and authority to examine, correct and punish the contempts, omissions, neglects, favors, corruptions and defaults of all justices of the peace, sheriffs, coroners, clerks and other officers, within this State;"[33] and 11 *Del. C.* § 6504, which provides that the DOC's duties are

---

[31] *Sandt v. Del. Solid Waste Auth.*, 640 A.2d 1030, 1034 (Del. 1994).
[32] *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010).
[33] 10 *Del. C.* § 542(a).

14

"subject only to powers vested in the judicial and certain executive departments and officers of the State."[34] The Superior Court explained that it had an obligation to assert jurisdiction to prevent constitutional violations. Expressly discussing the 1965 Superior Court case of *Tate*, the Court further reasoned that it had jurisdiction over DOC decisions "'where it is clearly shown that there has been a deprivation or infringement of constitutional rights of inmates.'"[35]

Neither of the two statutes relied upon authorize the Superior Court to transfer an inmate from one housing unit to another in a criminal proceeding. First, § 542 does not grant the Superior Court jurisdiction to transfer inmates. The cases interpreting § 542 show that the term "other officers" means only judicial officers other than those enumerated in the statute. In *Maryland & Olive Avenues Neighborhood Association v. Mayor of Rehoboth Beach*,[36] the Superior Court explained that § 542 "only permits [the] Superior Court to remedy defects in the administration of justice."[37] The court clarified that this understanding is based on the historical interpretation given to the original version of § 542, which was intended to allow the Superior Court to oversee "'inferior tribunals, acting under the

---

[34] 11 *Del. C.* § 6504.
[35] *Gibbs*, 2012 WL 6845687, at *3 (quoting *Tate*, 210 A.2d at 565).
[36] 1995 WL 654082 (Del. Super. Oct. 18, 1995).
[37] *Id.* at *6.

15

supervision of that court.'"[38]  This is consistent with the plain wording of § 542, which, when read in its entirety, discusses the Superior Court's jurisdiction over inferior judicial officers.

Additionally, § 542 has been applied almost exclusively to address conduct relating to judicial officers.[39]  There is one case (other than *Gibbs*) in which § 542 was construed as granting the Superior Court general supervisory authority over an executive branch official.[40]  But, that case was later contradicted by a case in which the Superior Court clarified that "other officers" within § 542's meaning did not include executive branch officials, but instead had the meaning that the court gave it in *Maryland & Olive Avenues*.[41]

Second, the *Gibbs* court's reading of the "subject only to" language in § 6504 is inconsistent with the interpretation this Court and the Superior Court have

---

[38] *Id.* (quoting *King v. Reading*, 5 Harr. 399, 400 (Del. 1852)).

[39] *See State v. Insley*, 141 A.2d 619, 623 (Del. 1958); *In re Sewell*, 153 A.2d 209, 210 (Del. Super. 1959).  *But see Vick v. Dep't of Corr.*, 1986 WL 8003, at *1 (Del. Super. Mar. 7, 1986) (explaining that "[§ 542] would appear to be a plenary grant of power, which in order to be effective, could encompass the appointment of counsel for prisoners in civil matters").

[40] *See Maul v. Warren*, 1992 WL 114111, at *3 (Del. Super. Apr. 24, 1992) (finding that court had jurisdiction to review Delaware State Police Superintendent's discipline of police officer).

[41] *See Smith v. Dep't of Pub. Safety*, 1999 WL 1225250, at *11 (Del. Super. Oct. 26, 1999) ("[T]he Court disagrees with the interpretation of § 542(a) set forth in *Maull*.  The Court stands by its interpretation of that section as set forth in its decision in *Maryland and Olive Avenues* . . . .").

16

consistently given that statute. In *State v. Goodman*,[42] for example, the Superior

Court explained:

> [The] DOC, and not this Court, has the power to classify an inmate. 11 *Del. C.* §§ 6504 and 6529. Even after the Institutional Classification Board makes a recommendation regarding classification, the Warden maintains "the power to veto decisions of the Board." 11 *Del. C.* § 6529(d). Thus, this Court does not have the power just to enter an order based on the pending motion instructing that [the] defendant must be moved from the SHU to another location.[43]

The Superior Court's reliance on the *Tate* case is also misplaced. *Tate* was a

mandamus proceeding, not a criminal prosecution, and, as further discussed

concerning mandamus, is distinguishable from this case on that basis alone.

Finally, McCoy relies on this Court's decision in *Bailey* to support his

argument that the Sixth Amendment right to counsel empowers the Superior Court

to order a detainee transferred to a lower level of security in a criminal case. In

*Bailey*, the defendant appealed his conviction of murder on several grounds, one of

which was that the State interfered with his Sixth Amendment right to counsel by

interrupting his phone calls with his attorney and destroying materials that he was

preparing to present to his attorney.[44] Before trial, Bailey filed a motion to be

---

[42] 2010 WL 547394 (Del. Super. Feb. 9, 2010).

[43] *Id.* at *1; *accord Dickens v. State*, 2010 WL 2889501, at *6 (Del. July 23, 2010); *Jackson v. Minner*, 2013 WL 871784, at *6 (Del. Super. Mar. 1, 2013); *Foster v. O'Connell*, 2002 WL 480961, at *2 (Del. Super. Mar. 13, 2002).

[44] *See Bailey*, 521 A.2d at 1083.

17

transferred from the maximum security unit, which the Superior Court denied. But the trial court "entered a detailed order permitting Bailey unlimited access to his attorney, free access to writing and legal material necessary to assist his attorney and liberal telephone privileges for discussions with his attorney."[45]

This Court first acknowledged that "[s]ituations involving interference with the assistance of counsel are subject to the general rule that the remedy should be tailored to the injury suffered and should not unnecessarily infringe upon society's competing interest in the administration of criminal justice."[46] This Court then commended the Superior Court's narrowly tailored remedy:

> We find that the manner in which the trial judge handled Bailey's claim of interference with counsel was exemplary and a model for the consideration of similar claims in the future. . . . [T]he trial court properly assessed the prejudice to Bailey and fashioned a remedy which was appropriate to the injury Bailey had sustained.[47]

McCoy correctly observes that *Bailey* is an example of the Superior Court protecting an inmate's Sixth Amendment right to counsel. However, the issue in *Bailey* was interference with counsel, and the remedy was narrowly tailored to address that problem. Nothing in *Bailey* supports the contention that the Superior

---

[45] *Id.* at 1084.
[46] *Id.*
[47] *Id.* at 1085.

18

Court's authority to protect a defendant's Sixth Amendment right to counsel in a criminal case extends to overriding the DOC's housing classification system and ordering a detainee transferred to a different housing unit in a criminal case.[48]

The Superior Court's authority to address an inmate's claims regarding his housing status or his other conditions of confinement lies within its authority to issue writs of mandamus or to hear civil cases alleging a violation of civil or constitutional rights under 42 U.S.C. § 1983.

While a mandamus proceeding provides the Superior Court with a jurisdictional basis to address claims relating to housing or other conditions of confinement, it is also necessary to recognize that mandamus is a limited remedy that requires the petitioner to establish that (a) he has a clear right to the performance of a duty by a public official or agency; (b) no other remedy is available; and (c) the public official or agency arbitrarily failed or refused to perform a duty.[49]

We have previously held that the classification of inmates for housing purposes is a discretionary decision and an inmate has no right to a particular housing classification.[50]

---

[48] The other cases cited by the Superior Court in *Gibbs* are either mandamus actions or cases which do not support the proposition that the Superior Court can transfer a detainee from one housing unit to another in a criminal case.

[49] *In re Hyson*, 649 A.2d 807, 808 (Del. 1994).

[50] *Desmond v. Phelps*, 2012 WL 424891, at *1 (Del. Feb. 8, 2012).

In addition, an inmate who seeks a change of housing units on the basis of a right protected by 42 U.S.C. § 1983 has an available remedy under that statute. The Superior Court recently explained that this is the proper course for an inmate seeking a housing reclassification to take:

> Pinkston alleges Fifth and Fourteenth Amendment Due Process violations and Eighth Amendment cruel and unusual punishment violations. Pinkston's allegations arise out of being reassigned to the Secured Housing Unit . . . . Pinkston is seeking a writ of mandamus to correct an alleged violation of his constitutional rights. However, the proper remedy for a violation of constitutional rights is through a 42 U.S.C. § 1983 action in the United States District Court, and not through the issuance of a writ of mandamus by this Court. Because Pinkston fails to meet one of the requirements for an issuance of a writ of mandamus—that mandamus is his sole avenue for relief—mandamus is inappropriate.[51]

The Superior Court has ample authority to protect a defendant's Sixth Amendment right to counsel in a criminal case and to fashion remedies for that purpose. But we hold here that those remedies do not include ordering the transfer of a detainee from his classified housing unit to another unit in a criminal case. Because we decide the case on the State's first contention, it is unnecessary to address its other contentions.

---

[51] *Pinkston v. State*, 2013 WL 6439360, at *1, *3 (Del. Super. Dec. 4, 2013).

20

### III. CONCLUSION

For the foregoing reasons, the Superior Court's order transferring McCoy out of SHU and into general population is vacated, and the case is remanded to the Superior Court for further proceedings.